**RECEIVED**

GSG/ZI/2009R00421

OCT 27 2011

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AT 8:30_____M
WILLIAM T. WALSH, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. ⊔∧P |
| v. | : | Crim. No. 11- 701 |
| | : | |
| ELIYAHU WEINSTEIN, | : | 18 U.S.C. §§ 1343, 1344, |
| a/k/a "Eli Weinstein," | : | 1349, 1957, 3147 & § 2 |
| a/k/a "Edward Weinstein," | : | |
| a/k/a "Eddie Weinstein," | : | |
| and | : | |
| VLADIMIR SIFOROV | : | |

## I N D I C T M E N T

The Grand Jury, in and for the District of New Jersey,

sitting at Newark, charges:

### COUNT ONE
### (Wire Fraud Conspiracy)
### (Defendant WEINSTEIN)

#### RELEVANT PARTIES AND ENTITIES

1.    At all times relevant to this Indictment:

a.    Defendant ELIYAHU WEINSTEIN, a/k/a "Eli

Weinstein," a/k/a "Edward Weinstein," a/k/a "Eddie Weinstein,"

was a resident of Lakewood, New Jersey, and purported to be a

real estate investor, operating through numerous entities that he

either owned or controlled, in whole or in part (collectively,

the "Weinstein Entities").

b.    The Weinstein Entities included, among others:

Pine Projects, LLC ("Pine Projects"); Black Tie Holdings, LLC

("Black Tie"); Bushwick Enterprise Group ("BEG"); Watch Hill

Funding, LLC ("Watch Hill"); PSRC, LLC ("PSRC"); Action Holdings,

LLC ("Action Holdings"); Citadel Investments, LLC ("Citadel"); E&R Developers, LLP ("E&R"); Sbarro Realty, Inc. ("Sbarro"); Vaad Lehakomas Kollelim ("V.L.K."); Yeshiva Gedola of Seagate ("Y.G.S."); and Portfolio Realty, LLC ("Portfolio").

c.    Defendant VLADIMIR SIFOROV was a resident of Manalapan, New Jersey.  Among other things, defendant SIFOROV purported to be a real estate investor in a number of real estate transactions orchestrated by defendant WEINSTEIN, which were in reality sham transactions.

d.    "A.Y.P." was a resident of Lakewood, New Jersey, and a signatory for bank accounts held in the name of PSRC, as well as V.L.K. and Y.G.S. - two purportedly "charitable" organizations.  At various times, A.Y.P. permitted defendant WEINSTEIN to use the PSRC, V.L.K. and Y.G.S. bank accounts, among others, in furtherance of the fraud described herein.  At various times, A.Y.P. also was employed by defendant WEINSTEIN at Pine Projects and solicited investments from victims on behalf of defendant WEINSTEIN.

e.    "B.H." was an attorney based in New York, New York, who represented defendant WEINSTEIN and a number of the Weinstein Entities in purported real estate transactions.  At various times, B.H. created legal documents which assisted defendant WEINSTEIN in perpetrating the fraud described herein, and allowed defendant WEINSTEIN to use B.H.'s attorney escrow accounts in furtherance of the fraud.

    f.    "M.G." was a resident of West Long Branch, New Jersey and, at various times, a partner of defendant WEINSTEIN in Pine Projects and BEG, as well as the signatory for bank accounts held in the name of Sbarro, among others.

    g.    "R.N." was a resident of Westfield, New Jersey, the principal of Watch Hill, and the signatory for bank accounts held in the names of Watch Hill, among others.  In addition, R.N. solicited investments from victims on behalf of defendant WEINSTEIN and permitted defendant WEINSTEIN to use bank accounts on which R.N. was a signatory in furtherance of the fraud described herein.

### THE SCHEME TO DEFRAUD

    2.    From at least as early as in or about June 2004 through in or about August 2011, defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," a/k/a "Edward Weinstein," a/k/a "Eddie Weinstein," and others, orchestrated and executed a real estate investment fraud scheme, pursuant to which they raised funds from victims for specific real estate transactions and used material portions of the raised funds for other purposes without disclosing these diversions of funds to victims.  The scheme resulted in losses of more than $200 million to victims.

    3.    In furtherance of the scheme to defraud, defendant WEINSTEIN and others made, and caused to be made, the following types of materially false and misleading statements and material

omissions, among others, to victims:

a.    defendant WEINSTEIN had inside access to certain real estate opportunities due to his connections at a bank or in the Orthodox Jewish community;

b.    as a result of such access, defendant WEINSTEIN, or a Weinstein Entity, owned or could purchase a particular parcel of real property, often at a below-market price;

c.    defendant WEINSTEIN had specific ownership interests in specific real property;

d.    the victim's money would be used to purchase a specific real estate property that would be quickly resold or "flipped," at a substantial profit, to a third-party purchaser that defendant WEINSTEIN had lined up;

e.    the victim's money would be held in escrow until the closing of a purported real estate transaction;

f.    the specific real estate transaction had closed successfully; and

g.    the victim's profits from a successfully closed transaction would be "rolled over" into other transactions.

4.    In furtherance of the scheme to defraud, defendant WEINSTEIN and others created, and caused to be created, the following types of fraudulent documents, among others, which were shown to victims and purported to reflect real estate transactions and the success of the real estate investments:

      a.    "show checks," which defendant WEINSTEIN led victims to believe represented defendant WEINSTEIN's investments in specific transactions, but which in fact were never deposited;

      b.    forged checks, previous versions of which had been negotiated for small amounts, but which defendant WEINSTEIN altered or caused to be altered so as to appear worth millions of dollars;

      c.    operating agreements, which showed that victims had ownership interests in specific properties, when in fact they did not;

      d.    legal documents, which defendant WEINSTEIN used to show victims purported interests in specific properties, when in fact there were no such interests;

      e.    leases, which represented that a property had substantial rental income, when in fact it did not; and

      f.    mortgages or deeds, which defendant WEINSTEIN claimed would serve as "collateral" for victims, but which in fact were worthless because defendant WEINSTEIN either did not possess any interests in the underlying properties, or because defendant WEINSTEIN had already conveyed interests in the same properties to other victims.

    5.    In furtherance of the scheme to defraud, defendant WEINSTEIN and others initially targeted victims from the Orthodox Jewish community, of which defendant WEINSTEIN was a member.

6.    Defendant WEINSTEIN and others exploited defendant WEINSTEIN's standing in, and knowledge of, the customs and practices of the Orthodox Jewish community in furtherance of the scheme in the following ways, among others:

a.    defendant WEINSTEIN used a portion of the proceeds of the fraud to fund "charitable and religious contributions," which he used to elevate his reputation within the Orthodox Jewish community;

b.    defendant WEINSTEIN asked rabbis and community members, many of whom benefitted from his contributions, to introduce him to victims and act as references for him with victims; and

c.    defendant WEINSTEIN abused the community's practice of engaging in transactions based on trust, and without extensive paperwork, to falsely represent to certain victims that specific real estate transactions existed, that the victims' monies were used to fund those transactions, and that the victims' profits from those transactions were being "rolled" into new investments.

7.    Despite defendant WEINSTEIN's efforts to conceal his fraudulent activities, by in or about 2010 his reputation in the Orthodox Jewish community was tarnished due to the massive losses caused by the scheme. Numerous victims had filed civil lawsuits against defendant WEINSTEIN, his co-conspirators, and others. As

a result, defendant WEINSTEIN found it difficult to obtain more money to further the scheme from within the Orthodox Jewish community.  Therefore, in or about April 2010, defendant WEINSTEIN, R.N., and others began soliciting victims from outside of the Orthodox Jewish community, who they defrauded out of additional millions of dollars.

    8.    Through the types of misrepresentations, omissions, fraudulent documents, and fraudulent conveyances discussed above, defendant WEINSTEIN and others obtained over $200 million from victims for purported real estate transactions.  In truth and in fact, however, defendant WEINSTEIN operated a Ponzi scheme.  He directed that material portions of monies raised from victims for specified transactions be used for other purposes, without disclosing the diversions of funds to victims, including:

        a.    to fund other, unrelated real estate transactions in which defendant WEINSTEIN was engaged;

        b.    to pay prior victims;

        c.    to gain victims' trust by making small payments to victims ("lulling payments"), which encouraged them to provide additional funds and allowed the fraudulent scheme to continue undetected;

        d.    to fund "charitable and religious contributions," which defendant WEINSTEIN and others used to elevate defendant WEINSTEIN's reputation within the Orthodox Jewish community in furtherance of the scheme;

- 7 -

e.    to enrich defendant WEINSTEIN, including the expenditure of millions of dollars on jewelry, art, gambling, and other items; and

f.    to pay defendant WEINSTEIN's personal expenses, including millions of dollars in credit card bills, legal bills, and luxury car lease payments.

### THE CONSPIRACY

9.    From at least as early as in or about June 2004 through in or about August 2011, in Ocean County, in the District of New Jersey, and elsewhere, defendant

ELIYAHU WEINSTEIN,
a/k/a "Eli Weinstein,"
a/k/a "Edward Weinstein,"
a/k/a "Eddie Weinstein,"

knowingly and intentionally conspired and agreed with others to devise a scheme and artifice to defraud and to obtain money and property from victims by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

### OBJECT OF THE CONSPIRACY

10.   The object of the conspiracy was for defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," a/k/a "Edward Weinstein," a/k/a "Eddie Weinstein," and others, to enrich themselves by obtaining

- 8 -

money from victims by making false and fraudulent representations
relating to purported real estate investments.

<u>**MANNER AND MEANS OF THE CONSPIRACY**</u>

11.   The manner and means by which defendant ELIYAHU
WEINSTEIN, a/k/a "Eli Weinstein," a/k/a "Edward Weinstein," a/k/a
"Eddie Weinstein," and others, sought to accomplish the
conspiracy included, among other things, the following:

<u>**Victim Investor "S.W."**</u>

12.   Victim investor S.W. was a member of the Orthodox
Jewish community who lived in Lakewood, New Jersey.  Between in
or about July 2004 and in or about August 2004, defendant
WEINSTEIN and others defrauded victim S.W. out of over $1 million
for purported real estate investments in Lakewood and Seaside
Park, New Jersey.

**401 Madison Avenue**

13.   For example, in or about July 2004, defendant WEINSTEIN
informed S.W. that he had inside access to a lucrative real
estate deal concerning a property located at 401 Madison Avenue,
Lakewood, New Jersey (the "401 Madison Property"), and made the
following misrepresentations, among others, to S.W.:

a.    defendant WEINSTEIN had the opportunity to
purchase the property for approximately $630,000 – a below-market
price;

b.    defendant WEINSTEIN had a buyer and a contract in

place for an immediate "flip" of the 401 Madison Property at a price of approximately $1.5 million;

     c.   if S.W. provided defendant WEINSTEIN with approximately $630,000, S.W. would have an ownership interest in the 401 Madison Property until it was sold, and S.W. and defendant WEINSTEIN would share the proceeds from the flip equally; and

     d.   if S.W. and defendant WEINSTEIN did not act immediately, they would lose the deal.

14.   Based on these misrepresentations, among others, on or about July 20, 2004, defendant WEINSTEIN caused S.W. to wire approximately $630,000 from a bank account controlled by S.W. in Florida to a Pine Projects bank account in New Jersey.

**Grog's Surf Palace**

15.   Between in or about July 2004 and in or about August 2004, defendant WEINSTEIN approached S.W. with another purported investment opportunity.  Defendant WEINSTEIN claimed that he had the opportunity to purchase Grog's Surf Palace in Seaside Park, New Jersey (the "Grog's Property").

16.   To induce S.W. to invest in the Grog's Property, defendant WEINSTEIN made the following misrepresentations, among others:

     a.   defendant WEINSTEIN knew the seller of the Grog's Property and was purchasing it for approximately $1 million;

      b.    defendant WEINSTEIN was personally invested in the deal;

      c.    defendant WEINSTEIN had a contract in place for an immediate flip of the Grog's Property at a substantially higher price; and

      d.    the transaction would close before the transaction involving the 401 Madison Property.

17.    Based on these misrepresentations, among others, between in or about July 2004 and in or about August 2004, defendant WEINSTEIN caused victim S.W. to wire approximately $550,000 from a bank account controlled by S.W. in Florida to a Pine Projects bank account in New Jersey.

18.    In fact, however, defendant WEINSTEIN did not have a contract in place for an immediate "flip" of the 401 Madison Property, and never arranged for S.W. to obtain a recorded ownership interest in the 401 Madison Property.  Similarly, defendant WEINSTEIN did not "flip" the Grog's Property quickly after S.W.'s investment, and never arranged for S.W. to obtain a recorded interest in the Grog's Property.

19.    Defendant WEINSTEIN never repaid the investments or profits he promised to S.W.  Instead, defendant WEINSTEIN obtained mortgages on the 401 Madison Property without S.W.'s knowledge or consent, and subsequently caused the property to be foreclosed upon when those mortgages were not repaid.

**Victim "Bank A"**

20.    Victim Bank A was a bank based in Chicago, Illinois, whose deposits were insured by the Federal Deposit Insurance Corporation.  As a result, Bank A was a "financial institution" as defined in Title 18, United States Code, Section 20.  From in or about September 2005 through in or about January 2008, defendant WEINSTEIN and others defrauded Bank A out of approximately $6 million in connection with a purported real estate transaction in Brooklyn, New York.

21.    In or about September 2005, defendant WEINSTEIN and M.G. entered into a contract to purchase property located at 1203-1209 DeKalb Avenue in Brooklyn, New York ("1209 DeKalb") through BEG.

22.    In or about February 2006 and March 2006, to finance BEG's purchase of 1209 DeKalb, defendant WEINSTEIN and M.G. obtained a mortgage of approximately $6 million from Bank A.  As a condition, Bank A made clear to defendant WEINSTEIN and M.G. that a capital contribution by defendant WEINSTEIN and M.G. was critical to Bank A's decision to fund the loan, as it would ensure that defendant WEINSTEIN and M.G. had a real interest in making the transaction successful.  Defendant WEINSTEIN falsely represented to Bank A that defendant WEINSTEIN and M.G., through BEG, would provide approximately $2 million of their own money to close the 1209 DeKalb transaction.

23.   Unbeknownst to Bank A, however, defendant WEINSTEIN
separately made arrangements with the sellers of 1209 DeKalb to
provide defendant WEINSTEIN with a second mortgage of
approximately $2 million to cover the cash required for the
closing.

24.   In or about March 2006, the 1209 DeKalb transaction
closed.  During the closing process, defendant WEINSTEIN, B.H.,
and others fraudulently induced Bank A to release the
approximately $6 million in mortgage funds by causing a fax
containing two fraudulent checks for approximately $2.1 million,
purportedly representing BEG's equity contribution to the 1209
DeKalb transaction, to be sent from the location of the closing,
in Brooklyn, New York, to Bank A's closing attorney on Long
Island, New York.

25.   In fact, however, the checks were merely "show checks"
designed to induce Bank A to release the mortgage money.  The
show checks were never negotiated or used to purchase 1209
DeKalb, and the accounts upon which they were drawn had
insufficient funds to cover the checks in any event.

26.   Defendant WEINSTEIN and others soon fell behind on the
mortgage payments to Bank A.  In or about January 2008, defendant
WEINSTEIN and others met with a representative of Bank A in New
York.  During this meeting, defendant WEINSTEIN admitted that he
did not, in fact, invest any money at the closing, and told the

Bank A representative, among other things, that defendant
WEINSTEIN had "f***ed" Bank A, and that Bank A should "get over
it" if they wanted to "solve the problem."

**Victim Investor "M.F."**

27.    Victim investor "M.F." was a member of the Orthodox
Jewish community and a real estate investor based in the United
Kingdom.  From in or about May 2007 through in or about October
2007, defendant WEINSTEIN and others defrauded M.F. out of
approximately $6.5 million in connection with purported real
estate transactions in New York and elsewhere.

28.    For example, in or about May 2007, defendant WEINSTEIN
approached M.F. and offered to sell M.F. 80 percent of BEG's
shares in 1209 DeKalb for approximately $4.8 million.

29.    To induce M.F., defendant WEINSTEIN falsely represented
to M.F., among other things, that BEG owned 1209 DeKalb outright,
and that a <u>bona</u> <u>fide</u> purchaser named "Siforov, Inc.," headed by
defendant SIFOROV, intended to buy the property for approximately
$16.2 million.  Defendant WEINSTEIN caused to be sent a "Share
Sale Agreement" to M.F., which set forth the terms of the
supposed sale to defendant SIFOROV.

30.    In or about May 2007, in reliance on these and other
false representations, M.F. wired approximately $4.8 million from
a bank account M.F. controlled in Europe to a bank account
controlled by defendant WEINSTEIN in New Jersey, in exchange for
80 percent of the shares in BEG.

31.  In fact, however, defendant SIFOROV never intended to purchase 1209 DeKalb and the supposed transaction with Siforov Inc. never closed.

32.  In or about October 2007, defendant WEINSTEIN falsely represented to M.F. that the transaction with defendant SIFOROV had closed, and encouraged M.F. to roll over M.F.'s "profits" into another real estate transaction with defendant WEINSTEIN.

33.  To "prove" that the deal with defendant SIFOROV had closed, defendant WEINSTEIN caused a fax containing a forged cashier's check, purportedly in the amount of approximately $9.9 million, to be sent from New Jersey to M.F. in the United Kingdom.  In fact, however, the forged cashier's check had been issued years earlier, to a different payee in a different, much smaller, amount.  Based on these and other misrepresentations, M.F. agreed to invest his "profits" into another transaction with defendant WEINSTEIN.

34.  In addition, based on the forged check and other misrepresentations, M.F. agreed to provide a loan to defendant WEINSTEIN, which defendant WEINSTEIN told M.F. would be secured by defendant WEINSTEIN's share of the purported proceeds from the sale of 1209 DeKalb to defendant SIFOROV.  As a result, on or about October 23, 2007, defendant WEINSTEIN caused M.F. to wire approximately $1.695 million from an account M.F. controlled in Europe to a bank account controlled by B.H. in New York.

- 15 -

**Victim Investor "H.D.W."**

35.   Victim investor H.D.W. was a member of the Orthodox
Jewish community and a real estate investor based in Bronxville,
New York.   H.D.W.'s companies invested money on behalf of H.D.W.
and a group of H.D.W.'s relatives, business partners and clients
(collectively, the "H.D.W. Investors").   From in or about March
2005 through in or about November 2005, defendant WEINSTEIN and
others fraudulently induced the H.D.W. Investors to provide at
least $70 million to defendant WEINSTEIN in connection with a
number of purported real estate development projects in New
Jersey, New York, and Georgia, among others.

**Staten Island**

36.   For example, in or about March 2005, defendant
WEINSTEIN induced the H.D.W. Investors to invest approximately $5
million in a real estate transaction involving a property located
at or around 2505 Forest Avenue, Staten Island, New York (the
"Staten Island Property") by:

a.   falsely representing to the H.D.W. Investors and
others that defendant WEINSTEIN had learned of an opportunity to
purchase the Staten Island Property for approximately $5.4
million and that M.G. had agreed to lease the property for
approximately $660,000 per year;

b.   presenting a fraudulent check to the H.D.W.
Investors and others reflecting purported lease payments by M.G.
on the Staten Island Property; and

c.   providing the H.D.W. Investors and others with an
Operating Agreement for the Staten Island Property dated on or
about March 30, 2005 (the "H.D.W. Staten Island Operating
Agreement"), which represented that H.D.W. would control the
entity which held the title to the Staten Island Property.

37.   In or about May 2005, defendant WEINSTEIN caused a
fraudulent "closing statement" for the Staten Island Property,
which showed a closing date of April 1, 2005, and a "Contract
Price" of approximately $5.4 million, to be faxed from defendant
WEINSTEIN's offices at Pine Projects in New Jersey to H.D.W.'s
offices in New York.

38.   In fact, however, defendant WEINSTEIN purchased the
Staten Island Property for only approximately $3.55 million; M.G.
never intended to make lease payments on the Staten Island
Property; and the documents reflecting such an agreement with
M.G. were fraudulent.

39.   Moreover, unbeknownst to the H.D.W. Investors, and
contrary to the H.D.W. Staten Island Operating Agreement,
defendant WEINSTEIN also caused a second Operating Agreement for
the Staten Island Property to be created, which listed defendant
WEINSTEIN, not H.D.W., as controlling the entity which held the
Staten Island Property.  Defendant WEINSTEIN then entered into
two separate mortgages, each for $2 million, on the Staten Island
Property and kept the proceeds for himself.  After entering into

the two mortgages through fraud, defendant WEINSTEIN failed to fulfill the requirements of the mortgages, and each of the mortgagees commenced foreclosure proceedings on the Staten Island Property.

**Trotwood, Georgia**

40.  Also in furtherance of the scheme, in or about September 2005, defendant WEINSTEIN caused the H.D.W. Investors to wire approximately $5.4 million from a bank account in New York to a Pine Projects bank account in New Jersey by, among other things, falsely representing to the H.D.W. Investors and others that the money would be used to purchase a property in Trotwood, Georgia, which was being leased to a national supermarket chain (the "Trotwood Georgia Property"). No such property existed. Indeed, there is no town of "Trotwood" in the state of Georgia. Moreover, the national supermarket chain has no records reflecting any involvement with defendant WEINSTEIN or the Weinstein Entities. Instead, defendant WEINSTEIN diverted the H.D.W. Investors' funds for other uses.

41.  To conceal the fraud, defendant WEINSTEIN and others caused to be issued a number of checks drawn on a Pine Projects account that purported to represent lease payments on the Trotwood Georgia Property. When representatives of H.D.W. approached defendant WEINSTEIN at the Pine Projects office in Lakewood, New Jersey, and sought to obtain paperwork from

defendant WEINSTEIN relating to the Trotwood Georgia Property, defendant WEINSTEIN stated, in sum and substance, that the paperwork was in his car, but that he had locked his keys in his car and therefore could not provide the paperwork to H.D.W.'s representatives.

42.    In or about March 2010, defendant WEINSTEIN met with one of H.D.W.'s representatives and asked the representative what the representative's wife and defendant WEINSTEIN had in common. When the representative indicated that he did not know, defendant WEINSTEIN replied: "We both f***ed you!"

**Victim Investor "B.B."**

43.    Victim investor "B.B." was a member of the Orthodox Jewish community and a real estate investor based in the United Kingdom.  From in or about December 2006 to in or about January 2007, defendant WEINSTEIN and others fraudulently induced B.B. and his group of investors (collectively, the "B.B. Investors") to invest approximately $36.5 million with defendant WEINSTEIN and others in connection with two real estate development projects in Philadelphia, Pennsylvania known as "River City" and "2040 Market Street."

44.    In or about December 2006 and January 2007, defendant WEINSTEIN and others made, or caused to be made, the following misrepresentations, among others, to induce the B.B. Investors to invest with defendant WEINSTEIN and others:

- 19 -

a.    the B.B. Investors' money would be used to purchase River City and 2040 Market Street, when, in fact, the majority of the money was not so used;

b.    the River City project had received approximately $51.5 million in financing, when defendant WEINSTEIN and others, in fact, knew that there was never any such loan in place;

c.    River City had been valued at approximately $77 million in an appraisal, when defendant WEINSTEIN and others, in fact, knew the appraisal was based on false information;

d.    an independent investor had written several letters indicating that he wished to purchase the air rights to 2040 Market Street - that is, the right to develop vertically above the property - for up to approximately $31 million, when defendant WEINSTEIN and others, in fact, knew that these air rights offers were fabricated; and

e.    $23 million was needed to pay down the mortgage on 2040 Market Street in order to sell the 2040 Market Street air rights, and defendant WEINSTEIN had paid a significant portion of the mortgage down, as well as other costs, when defendant WEINSTEIN and others, in fact, knew that defendant WEINSTEIN had made no such payments.

45.    Defendant WEINSTEIN misappropriated for other uses all but approximately $12 million of the B.B. Investors' approximately $36.5 million investment in River City and 2040

Market Street.   While approximately $12 million of the B.B.
Investors' money was invested in River City, no interest in the
property was conveyed to the B.B. Investors.

46.   Subsequently, in or about January 2007, defendant
WEINSTEIN provided B.B. and others copies of forged checks in the
total amount of approximately $49 million to conceal from B.B.
and others that the B.B. Investors' investment had not been used
as defendant WEINSTEIN had represented.

47.   Specifically, defendant WEINSTEIN instructed his
attorney to prepare a letter detailing the money that defendant
WEINSTEIN allegedly spent to purchase and finance River City and
2040 Market Street, and caused to be attached to the letter
copies of five checks (the "January 2007 Letter").   Defendant
WEINSTEIN then caused the January 2007 Letter to be faxed from
New Jersey to the B.B. Investors in the United Kingdom.

48.   The check copies attached to the January 2007 Letter
were fraudulent.   For example, one of the check copies sent to
the B.B. Investors appeared to be of a cashier's check for
approximately $4.66 million, that was dated on or about December
20, 2006, and that supposedly reflected defendant WEINSTEIN's
payment of closing costs for one of the Philadelphia properties.
In reality, however, the check was a cashier's check in the
amount of $10.00 which was purchased on or about January 29, 2007
and then altered to make it appear as though the check was dated

on or about December 20, 2006 (the closing date for one of the Philadelphia properties) and in the amount of approximately $4.66 million, not $10.00.

**Victim Investor "M.M."**

49. Victim investor "M.M." was a member of the Orthodox Jewish community and a real estate investor based in the United Kingdom. From in or about May 2007 through in or about October 2007, defendant WEINSTEIN and others fraudulently induced M.M. to invest over $27 million with defendant WEINSTEIN in connection with purported real estate development projects in Arizona, Florida, New Hampshire, New Jersey, Ohio and Pennsylvania. Rather than invest in any purported real estate transactions as he represented to M.M., defendant WEINSTEIN misappropriated all or substantially all of M.M.'s money.

**Trotwood, Ohio**

50. To induce M.M. to invest in a property supposedly located at 5320 Salem Avenue in Trotwood, Ohio (the "Trotwood Ohio Property"), defendant WEINSTEIN and others fabricated, and caused to be fabricated, a number of documents which were presented to M.M. For example, on or about May 29, 2007, defendant WEINSTEIN caused a Pine Projects employee to send a fax from New Jersey to M.M. in the United Kingdom. The fax included several material misrepresentations concerning the Trotwood Ohio Property, including that "[t]he income" for the commercial

property would be "$400,000.00 per year" under a "10 year lease w/ options" that defendant WEINSTEIN claimed to possess. The lease, in turn, supposedly was executed on or about April 13, 2007, between "Verona Group LLC," an entity that used Pine Projects' address, and an entity purportedly named "Bargain Buys Inc." The lease was fraudulent. Among other things, no such tenant existed, nor was any such entity shown the property by the purported broker.

51. Based on these and other misrepresentations, in or about June 2007, M.M. wired approximately $9 million from an account controlled by M.M. in the United Kingdom to an account controlled by B.H. in New York in connection with the Trotwood Ohio Property.

**Owl's Nest**

52. To induce M.M. to invest in a New Hampshire property known as "Owl's Nest," defendant WEINSTEIN claimed to have approximately $9 million in escrow at a title agency that would be used to help acquire this property. As proof, in or around June 2007, defendant WEINSTEIN provided M.M. a print-out of an e-mail purportedly sent to defendant WEINSTEIN's personal e-mail account. The e-mail purportedly was from "Jim DeMonter Esq." at "Olympic Title," with an e-mail address of "olympic_title@yahoo.com" and stated that "we are currently holding $9,000,000 (9 MILLION DOLLARS) in our escrow account. . .

towards the property known as Owl's Nest." The e-mail was fraudulent. In fact, no such title company existed; no such individual existed; and the e-mail address "olympic_title@yahoo.com" was created in or around Brooklyn, New York.

53. Based on these and other misrepresentations, in or about July 2007, M.M. wired approximately $10 million from an account controlled by M.M. in the United Kingdom to an account controlled by B.H. in New York in connection with the Owl's Nest transaction.

**Victim Investor "R.B.S."**

54. Victim investor R.B.S. was a widowed retiree living in or around Los Angeles, California, who worked to assist orphaned and poor children in Israel.

55. From in or about May 2009 through in or about July 2009, defendant WEINSTEIN, A.Y.P., and others made numerous false representations to R.B.S., which were intended to induce R.B.S. to invest money with defendant WEINSTEIN. These misrepresentations included, among others, the following:

a. defendant WEINSTEIN, A.Y.P., and others needed capital for a short period of time to use in connection with pending real estate transactions;

b. if R.B.S. provided approximately $1,200,000 to defendant WEINSTEIN, A.Y.P., and others, then R.B.S. would

- 24 -

receive back both her principal as well as a significant amount of interest within three weeks;

        c.   R.B.S. could use her "profits" from the transaction to further R.B.S.'s charitable endeavors;

        d.   if R.B.S. invested with defendant WEINSTEIN, defendant WEINSTEIN, A.Y.P, and others would help fulfill R.B.S.'s dream of a music school for orphaned and poor children in Israel; and

        e.   the investments were safe, secure, and reliable.

    56.  In reliance on these and other misrepresentations, on or about July 15, 2009, R.B.S. gave A.Y.P. approximately $10,000 in cash, a check for $14,985.96 drawn on R.B.S.'s line of credit, and approximately $15,000 that R.B.S. advanced from R.B.S.'s credit cards.

    57.  On or about July 19, 2009, defendant WEINSTEIN promised to secure any investment that R.B.S. made with him. Specifically, defendant WEINSTEIN promised to provide R.B.S. with collateral interests in three properties, located in or around Lakewood, New Jersey, that defendant WEINSTEIN claimed he owned or controlled. In fact, defendant WEINSTEIN did not possess any interest in the three Lakewood properties that he pledged to R.B.S. They were either fraudulently obtained, pledged to other victims of defendant WEINSTEIN's scheme to defraud, or were in foreclosure proceedings before defendant WEINSTEIN pledged them

to R.B.S.  For example, one of the properties defendant WEINSTEIN
pledged to R.B.S. was the 401 Madison Property.  As discussed in
paragraphs 13 and 14, above, defendant WEINSTEIN had used S.W.'s
money to purchase the 401 Madison Property, and purportedly
transferred an ownership interest in that Property to S.W. years
earlier.  S.W. was not aware of, and did not approve, these
subsequent transfers.  Moreover, before defendant WEINSTEIN
pledged it to R.B.S., the 401 Madison Property had been placed in
foreclosure proceedings by yet another investor of defendant
WEINSTEIN's, to whom he had also pledged an interest in the 401
Madison Property.

    58.  On or about July 21, 2009, in reliance on the
misrepresentations described above, among others, R.B.S.
mortgaged certain properties that R.B.S. owned to obtain cash to
invest with defendant WEINSTEIN and others.  R.B.S. then wired:
(1) approximately $870,623.68 from a bank account in California
to an account in the name of PSRC located in New Jersey; and
(2) approximately $200,000 from a bank account in California to
an account in the name of "63-20 Austin LLC" located in New York.

    59.  R.B.S.'s investment with defendant WEINSTEIN, A.Y.P.,
and others was not used in connection with any real estate
transaction.  In addition, R.B.S. did not receive her principal
and interest in three weeks as promised by defendant WEINSTEIN,
A.Y.P., and others.  As a result, R.B.S. began sending defendant

WEINSTEIN e-mails asking for the return of R.B.S.'s money. For example, on or about June 11, 2010, R.B.S. sent an e-mail to defendant WEINSTEIN, imploring defendant WEINSTEIN to "stop screwing around" and to "send the money!!!" The next morning, defendant WEINSTEIN responded to R.B.S.'s e-mail by writing simply: "F*** u."

**Defendant WEINSTEIN Expands The Scheme**
**Outside of the Orthodox Jewish Community**

60. Beginning in or about April 2010, defendant WEINSTEIN, R.N., and others began soliciting victims from outside of the Orthodox Jewish community (collectively, the "Later Victims"). Among others, R.N. used his contacts in the finance industry to recruit the following Later Victims, whom defendant WEINSTEIN and R.N. defrauded of more than $7 million in a series of sham real estate transactions:

a. Victim investor "T.S.," the principal of a hedge fund based in Bronxville, New York, who had known R.N. since in or about 1988;

b. Victim investors "A.M." and "M.D.," the principals of a hedge fund based in New York, New York, who had known R.N. since in or about 2005;

c. Victim investor "J.C.," the president and founder of an investment banking firm located in New York, New York, who first met R.N. in or about 2005. Among other clients, J.C. managed investments for "V.P.F.," a 501(c)(3) charitable

organization dedicated to helping underprivileged children in New York City;

      d.    Victim investors "A.H." and "P.H.," J.C.'s mother-in-law and father-in-law, respectively, who resided on Long Island, New York;

      e.    Victim investor "D.K.," an investor based in Chicago, Illinois, and a childhood friend of J.C.; and

      f.    Victim investor "P.M.," an investor based in Chicago, Illinois, and an employee of a company that D.K. controlled.

    61.    To induce the Later Victims to invest with defendant WEINSTEIN and R.N., between in or about April 2010 and August 2010, defendant WEINSTEIN and R.N. made the following types of misrepresentations, among others:

      a.    due in part to WEINSTEIN's connections at banks and within the Orthodox Jewish community, defendant WEINSTEIN and R.N. had the opportunity to purchase certain distressed real estate at below market prices;

      b.    defendant WEINSTEIN and R.N. had invested in the deals, but were short the funds necessary to close the transactions;

      c.    defendant WEINSTEIN and R.N. had buyers lined up - also from within the Orthodox Jewish community - to whom they would flip the real estate at significantly higher prices;

d.    the Later Victims would share 50 percent of the profits from the deals on a <u>pro rata</u> basis, and defendant WEINSTEIN and R.N. would share the other 50 percent;

e.    the Later Victims' money would be held in escrow until the deals closed;

f.    in the event the flips to the buyers fell through, the Later Victims would be collateralized by the real property they were purchasing, further underscoring that there was "no risk" to them; and

g.    defendant WEINSTEIN would give the Later Victims phony deeds to properties that defendant WEINSTEIN falsely claimed to own, in whole or in part, as collateral for their investments.

62.    Based on the types of false representations, omissions, and fraudulent documents described above, defendant WEINSTEIN and R.N. caused the Later Victims to make the following investments with defendant WEINSTEIN and R.N.:

a.    between in or about April 2010 and in or about May 2010, T.S. caused approximately $585,000 to be wired from bank accounts in New York to bank accounts in New Jersey controlled by defendant WEINSTEIN and R.N. for a purported investment in condominiums located in Florida;

b.    in or about April 2010, A.M. and M.D. caused approximately $525,000 to be wired from bank accounts in New York

to bank accounts in New Jersey controlled by defendant WEINSTEIN for a purported investment in condominiums located in Florida;

       c.   between in or about May 2010 and in or about June 2010, J.C. caused approximately $1.54 million in funds that J.C. managed for V.P.F. to be wired from bank accounts in New York to bank accounts in New Jersey controlled by defendant WEINSTEIN and R.N. for purported investments in condominiums located in Florida, a shopping center located in Philadelphia (the "Tacony Street Transaction"), and a shopping center located in Lakewood, New Jersey (the "Seagull Square Transaction");

       d.   between in or about May 2010 and in or about July 2010, A.H. and P.H. caused approximately $800,000 to be wired from bank accounts in New York to bank accounts in New Jersey controlled by defendant WEINSTEIN and R.N. for purported investments in the Seagull Square Transaction and the purchase of five apartment buildings located in Brooklyn, New York (the "Brooklyn Apartment Buildings"); and

       e.   between in or about July 2010 and in or about August 2010, D.K. and P.M. caused approximately $4.67 million to be wired from bank accounts in Illinois to bank accounts in New Jersey controlled by defendant WEINSTEIN and R.N. for purported investments in the Seagull Square Transaction, the Tacony Street Transaction, the Brooklyn Apartment Buildings, and the alleged purchase of a town home development in upstate New York.

63.   In fact, however, and contrary to defendant WEINSTEIN's and R.N.'s representations, none of the funds defendant WEINSTEIN and R.N. solicited from the Later Victims were held in escrow, nor were they used to fund any of the real estate transactions presented to the Later Victims.   Rather, defendant WEINSTEIN and R.N. used the money raised from the Later Victims to, among other things: pay prior victims of the scheme; make lulling payments to the Later Victims themselves; and pay defendant WEINSTEIN's and R.N.'s personal expenses, including legal fees and credit card bills.

**The "M.R." Fraud**

64.   Victim investor M.R. was a member of the Orthodox Jewish community and an accountant residing in and around Staten Island, New York.   From in or about July 2008 through in or about August 2010, defendant WEINSTEIN defrauded M.R., and a number of investors M.R. introduced to defendant WEINSTEIN (collectively, the "M.R. Investors"), of more than $2 million, pursuant to the scheme to defraud described above.

65.   As a result of these losses, M.R. sought to recover money for himself and the M.R. Investors.   Defendant WEINSTEIN represented to M.R. that he had new deals which would allow M.R. to recover all of M.R.'s losses, as well as the losses of the M.R. Investors.   But these new deals, too, were fraudulent.   For example, beginning in or about February 2011 and continuing

through in or about May 2011, defendant WEINSTEIN defrauded M.R.
of over $100,000 in connection with, among other things, an
"insurance deal." Defendant WEINSTEIN induced M.R. to invest in
the insurance deal by making the following misrepresentations,
among others:

      a.   M.R. could, for an "investment" of approximately
$135,000, become the substitute beneficiary of a life insurance
policy held by an elderly woman who was terminally ill, and
thereby receive up to $5 million when the woman died;

      b.   defendant WEINSTEIN was bringing this deal to M.R.
because M.R. and the M.R. Investors lost money with defendant
WEINSTEIN, and defendant WEINSTEIN wished to make them whole; and

      c.   defendant WEINSTEIN had no stake in this deal.

    66.  In reliance on the above misrepresentations, among
others, on or about February 16, 2011, M.R. caused approximately
$101,700 to be wired from a bank account located in New York to a
bank account in New Jersey held in the name of Portfolio Realty
(the "Portfolio Realty Bank Account"). Unbeknownst to M.R., the
Portfolio Realty Bank Account had been opened by an individual
with the initials "D.T.," but was controlled by defendant
WEINSTEIN, who had separately arranged with D.T. for defendant
WEINSTEIN to assume control over the account for a fee. As part
of this arrangement, defendant WEINSTEIN convinced D.T. to
provide defendant WEINSTEIN with blank checks, drawn on the
Portfolio Realty Bank Account and signed by D.T.

67.    Contrary to his representations, however, defendant WEINSTEIN did not use M.R.'s money to "invest" in any life insurance policy.  Rather, defendant WEINSTEIN used the bulk of M.R.'s "investment" for his personal use, including the following payments:

        a.    thousands of dollars to lawyers associated with or directly retained by defendant WEINSTEIN;

        b.    thousands of dollars to prior victims of defendant WEINSTEIN; and

        c.    thousands of dollars to the private school attended by at least one of defendant WEINSTEIN's children.

### PROCEEDS OF THE FRAUD

68.    Through the types of misrepresentations, omissions, fraudulent documents, and fraudulent conveyances discussed above, defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," a/k/a "Edward Weinstein," a/k/a "Eddie Weinstein," and others, obtained more than $200 million dollars from victims for purported real estate transactions.  Rather than use the victims' funds for specified transactions as he claimed he would, defendant WEINSTEIN misappropriated the victims' funds, and used material portions of monies raised for other purposes, including:

        a.    to fund other, unrelated real estate transactions in which defendant WEINSTEIN was engaged;

        b.    to pay prior victims;

      c.   to make lulling payments;

      d.   to fund "charitable and religious contributions," which defendant WEINSTEIN used to elevate his reputation within the Orthodox Jewish community in furtherance of the fraud;

      e.   to enrich defendant WEINSTEIN, including: the purchase of millions of dollars worth of antique Judaica and other artwork; a multi-million dollar collection of jewelry and watches; and gambling in Las Vegas and elsewhere; and

      f.   to pay defendant WEINSTEIN's personal expenses, including millions of dollars in credit card bills, millions of dollars in legal bills, and luxury car-lease payments.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH THIRTY
### (Wire Fraud)
### (Defendants WEINSTEIN and SIFOROV)

1.    The allegations set forth in Paragraphs 1 through 8 and 11 through 68 of Count One above are hereby repeated, realleged and incorporated as if fully set forth herein.

2.    From at least as early as in or about June 2004 through in or about May 2011, in Ocean County, in the District of New Jersey and elsewhere, defendants

ELIYAHU WEINSTEIN,
a/k/a "Eli Weinstein,"
a/k/a "Edward Weinstein,"
a/k/a "Eddie Weinstein,"
and
VLADIMIR SIFOROV

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money and property from victims by means of materially false and fraudulent pretenses, representations, and promises.

3.    On or about the dates set forth below, in Ocean County, in the District of New Jersey, and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice, the defendants set forth below did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures and sounds, each constituting a separate count of this Indictment:

- 35 -

| Count | Defendant(s) | Approximate Date | Description |
|-------|--------------|------------------|-------------|
| 2 | WEINSTEIN | December 19, 2006 | Wire transfer of approximately $9,500,000 from a bank account in Europe controlled by B.B. to a Pine Projects bank account in New Jersey |
| 3 | WEINSTEIN | January 8, 2007 | Wire transfer of approximately $4,000,000 from a bank account in Europe controlled by B.B. to a Pine Projects bank account in New Jersey |
| 4 | WEINSTEIN | January 8, 2007 | Wire transfer of approximately $6,000,000 from a bank account in Europe controlled by B.B. to a Pine Projects bank account in New Jersey |
| 5 | WEINSTEIN | January 19, 2007 | Wire transfer of approximately $5,000,000 from a bank account in Europe controlled by B.B. to a Pine Projects bank account in New Jersey |
| 6 | WEINSTEIN | January 29, 2007 | Facsimile containing five fraudulent checks in the amount of approximately $49 million sent from New Jersey to B.B. in the United Kingdom |
| 7 | WEINSTEIN and SIFOROV | May 15, 2007 | Wire transfer of approximately $1,250,000 from a bank account in Europe controlled by M.F. to a Pine Projects bank account in New Jersey |
| 8 | WEINSTEIN and SIFOROV | May 16, 2007 | Wire transfer of approximately $3,550,000 from a bank account in Europe controlled by M.F. to a Pine Projects bank account in New Jersey |
| 9 | WEINSTEIN | May 29, 2007 | Facsimile from Pine Projects in New Jersey to M.M. in Europe falsely describing a real estate investment opportunity in Trotwood, Ohio |
| 10 | WEINSTEIN and SIFOROV | October 16, 2007 | Facsimile of a fraudulent check in the amount of $9,964,000 sent from New Jersey to M.F. in the United Kingdom |
| 11 | WEINSTEIN | July 21, 2009 | Wire transfer of approximately $870,623.68 from a bank account in California controlled by R.B.S. to a PSRC bank account in New Jersey |

| Count | Defendant(s) | Approximate Date | Description |
|---|---|---|---|
| 12 | WEINSTEIN | April 19, 2010 | Wire transfer of approximately $270,000 from a bank account in New York controlled by T.S. to an Action Holdings bank account in New Jersey |
| 13 | WEINSTEIN | April 20, 2010 | Wire transfer of approximately $150,000 from a bank account in New York controlled by T.S. to an Action Holdings bank account in New Jersey |
| 14 | WEINSTEIN | May 4, 2010 | Wire transfer of approximately $525,000 from a bank account in New York controlled by A.M. and M.D. to an Action Holdings bank account in New Jersey |
| 15 | WEINSTEIN | May 12, 2010 | Wire transfer of approximately $175,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to a Watch Hill Funding bank account in New Jersey |
| 16 | WEINSTEIN | May 18, 2010 | Wire transfer of approximately $165,000 from a bank account in New York controlled by T.S. to a Watch Hill Funding bank account in New Jersey |
| 17 | WEINSTEIN | May 25, 2010 | Wire transfer of approximately $250,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to a Watch Hill Funding bank account in New Jersey |
| 18 | WEINSTEIN | May 26, 2010 | Wire transfer of approximately $240,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to a Watch Hill Funding bank account in New Jersey |
| 19 | WEINSTEIN | June 11, 2010 | Wire transfer of approximately $350,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to an Action Holdings bank account in New Jersey |
| 20 | WEINSTEIN | June 16, 2010 | Wire transfer of approximately $300,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to a Watch Hill Funding bank account in New Jersey |

| Count | Defendant(s) | Approximate Date | Description |
|-------|--------------|------------------|-------------|
| 21 | WEINSTEIN | June 23, 2010 | Wire transfer of approximately $400,000 from a bank account in New York controlled by J.C. on behalf of V.P.F. to a Citadel Investments bank account in New Jersey |
| 22 | WEINSTEIN | July 6, 2010 | Wire transfer of approximately $300,000 from a bank account in New York controlled by A.H. and P.H. to a Watch Hill Funding bank account in New Jersey |
| 23 | WEINSTEIN | July 8, 2010 | Wire transfer of approximately $200,000 from a bank account in Illinois controlled by D.K. to a Watch Hill Funding bank account in New Jersey |
| 24 | WEINSTEIN | July 8, 2010 | Wire transfer of approximately $700,000 from a bank account in Illinois controlled by D.K. to an Action Holdings bank account in New Jersey |
| 25 | WEINSTEIN | July 28, 2010 | Wire transfer of approximately $300,000 from a bank account in New York controlled by A.H. and P.H. to an E&R Developers bank account in New Jersey |
| 26 | WEINSTEIN | August 2, 2010 | Wire transfer of approximately $2,000,000 from a bank account in Illinois controlled by D.K. to a Citadel Investments bank account in New Jersey |
| 27 | WEINSTEIN | August 3, 2010 | Wire transfer of approximately $450,000 from an Action Holdings bank account in New Jersey to a bank account in Illinois controlled by D.K. |
| 28 | WEINSTEIN | August 9, 2010 | Wire transfer of approximately $100,000 from a bank account in Illinois controlled by D.K. to an Action Holdings bank account in New Jersey |
| 29 | WEINSTEIN | August 11, 2010 | Wire transfer of approximately $591,000 from a bank account in Illinois controlled by D.K. to an Action Holdings bank account in New Jersey |

| Count | Defendant(s) | Approximate Date | Description |
|-------|--------------|------------------|-------------|
| 30 | WEINSTEIN | August 11, 2010 | Wire transfer of approximately $409,000 from a bank account in Illinois controlled by D.K. to an Action Holdings bank account in New Jersey |

In violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

## COUNTS THIRTY-ONE THROUGH THIRTY-TWO
### (Wire Fraud)
### (Defendant WEINSTEIN)

1.  The allegations set forth in Paragraphs 1 through 8 and 11 through 68 of Count One above are hereby repeated, realleged and incorporated as if fully set forth herein.

2.  On or about August 12, 2010, a criminal complaint was filed in the District of New Jersey charging defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," a/k/a "Edward Weinstein," a/k/a "Eddie Weinstein," with bank fraud, in violation of 18 U.S.C. §§ 1344 & 2, and wire fraud, in violation of 18 U.S.C. §§ 1343 & 2.

3.  From on or about August 12, 2010, to in or about August 2011, defendant WEINSTEIN was on pretrial release, pending indictment and trial on these charges, as ordered by the Hon. Mark Falk, United States Magistrate Judge, pursuant to 18 U.S.C. §§ 3141 et seq.

4.  On or about the dates set forth below, in Ocean County, in the District of New Jersey and elsewhere, defendant

> ELIYAHU WEINSTEIN,
> a/k/a "Eli Weinstein,"
> a/k/a "Edward Weinstein,"
> a/k/a "Eddie Weinstein,"

while on pretrial release pursuant to 18 U.S.C. §§ 3141 et seq., did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money and property from victims by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of

executing and attempting to execute this scheme and artifice, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures and sounds, each constituting a separate count of this Indictment:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 31 | February 16, 2011 | Wire transfer of approximately $33,000 from a bank account in New York controlled by M.R. to a Portfolio Realty bank account in New Jersey |
| 32 | February 16, 2011 | Wire transfer of approximately $68,700 from a bank account in New York controlled by M.R. to a Portfolio Realty bank account in New Jersey |

In violation of Title 18, United States Code, Sections 1343 and 3147, and Title 18, United States Code, Section 2.

## COUNT THIRTY-THREE
### (Bank Fraud)
### (Defendant WEINSTEIN)

1.    The allegations set forth in Paragraph 1 and 20 through 26 of Count One above are hereby repeated, realleged and incorporated as if fully set forth herein.

2.    From in or about February 2006 through in or about March 2008, in Ocean County, in the District of New Jersey, and elsewhere, defendant

ELIYAHU WEINSTEIN,
a/k/a "Eli Weinstein,"
a/k/a "Edward Weinstein,"
a/k/a "Eddie Weinstein,"

did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud a financial institution, namely Bank A, and to obtain money, funds, and assets owned by and under the custody and control thereof, by means of materially false and fraudulent pretenses, representations, and promises.

3.    It was part of the scheme and artifice that defendant WEINSTEIN fraudulently obtained a mortgage of approximately $6 million from Bank A for the alleged purchase of the 1209 DeKalb property by falsely representing that defendant WEINSTEIN was contributing approximately $2.1 million of his entity's funds towards the purchase of the property.

In violation of Title 18, United States Code, Section 1344 and Section 2.

## COUNTS THIRTY-FOUR THROUGH FORTY-FIVE
### (Transacting in Criminal Proceeds)
### (Defendant WEINSTEIN)

1.    The allegations set forth in paragraphs 1 through 8 and 11 through 68 of Count One above, are hereby repeated, realleged and incorporated as if fully set forth herein.

2.    On or about the dates set forth below, in Ocean County, in the District of New Jersey, and elsewhere, defendant

ELIYAHU WEINSTEIN,
a/k/a "Eli Weinstein,"
a/k/a "Edward Weinstein,"
a/k/a "Eddie Weinstein,"

knowingly engaged and attempted to engage in monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is wire fraud, in violation of Title 18, United States Code Sections 1343 and 2, as follows:

| Count | Approximate Date | Monetary Transaction |
|-------|------------------|----------------------|
| 34 | April 19, 2010 | Check in the approximate amount of $50,000 drawn on the account of Action Holdings in New Jersey made payable to an entity controlled by H.D.W. in New York |
| 35 | April 19, 2010 | Check in the approximate amount of $115,000 drawn on the account of Action Holdings in New Jersey made payable to an B.H.'s law firm in New York |
| 36 | June 16, 2010 | Check in the approximate amount of $250,000 drawn on the account of Watch Hill Funding in New Jersey made payable to an entity controlled by H.D.W. in New York |

| Count | Approximate Date | Monetary Transaction |
|-------|------------------|----------------------|
| 37 | June 23, 2010 | Wire transfer of approximately $25,000 from a Citadel Investments bank account in New Jersey to the bank account of "Law Firm A" in Pennsylvania |
| 38 | July 8, 2010 | Check in the approximate amount of $100,000 drawn on the account of Action Holdings in New Jersey made payable to "M.S." in New York |
| 39 | July 28, 2010 | Check in the approximate amount of $50,000 drawn on the account of E&R Developers in New Jersey made payable to "E.A." in New York |
| 40 | July 8, 2010 | Wire transfer of approximately $20,000 from an Action Holdings bank account in New Jersey to the bank account of R.B.S. in California |
| 41 | August 2, 2010 | Wire transfer of approximately $50,000 from a Citadel Investments bank account in New Jersey to the bank account of R.B.S. in California |
| 42 | August 2, 2010 | Wire transfer of approximately $75,000 from a Citadel Investments bank account in New Jersey to the bank account of M.R. in New York |
| 43 | August 2, 2010 | Wire transfer of approximately $100,000 from a Citadel Investments bank account in New Jersey to the bank account of Law Firm A in Pennsylvania |
| 44 | August 3, 2010 | Wire transfer of approximately $450,000 from an Action Holdings bank account in New Jersey to a bank account in Illinois controlled by D.K. |
| 45 | August 11, 2010 | Wire transfer of approximately $100,000 from an Action Holdings bank account in New Jersey to the bank account of "Company A" in New York |

In violation of Title 18, United States Code, Section 1957 and Section 2.

## FIRST FORFEITURE ALLEGATION

1.    The allegations contained in Counts 1 through 45 of this Indictment are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(c) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

2.    The United States hereby gives notice to the defendants charged in Counts 1 through 33 that, upon their conviction of any such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Sections 981(a)(1)(c) and 982(a)(2)(A) and Title 28, United States Code, Section 2461(c), which requires any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to:

(a) a sum of money equal to at least $200 million in United States currency;

(b) approximately $822,091.76 previously on deposit at TD Bank account number 7864181297, and related accounts, held in the name of Action Holdings;

(c) approximately $13,348.13 previously on deposit at Bank of America account number 381022014968 held in the name of Citadel Investments;

(d) approximately $1,589.43 previously on deposit

- 45 -

at Bank of America account number 381020694762 held in the name of Rivka Bichler;

(e) approximately $11.72 previously on deposit at Bank of America account number 381022014971 held in the name of E & R Developers LLC;

(f) approximately $32,385.86 previously on deposit at Provident Bank account number 601213474 held in the name of Watch Hill Funding LLC;

(g) approximately $984.51 previously on deposit at Provident Bank account number 832600555 held in the name of Watch Hill Funding LLC;

(h) approximately $228.59 previously on deposit at Wachovia Bank account number 31201467 held in the name of Chaya Riki Epstein;

(i) approximately 81 pieces of jewelry seized on or about August 12, 2010, from the residence located at 596 Seton Circle, Lakewood, New Jersey;

(j) approximately 9 items of Judaica art seized on or about August 12, 2010, from the residence located at 596 Seton Circle, Lakewood, New Jersey.

3.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in paragraph 2.

## SECOND FORFEITURE ALLEGATION

1.    The allegations contained in Counts 1 through 45 of
this Indictment are hereby realleged and incorporated by
reference for the purpose of noticing forfeitures pursuant to
Title 18, United States Code, Section 982.

2.    The United States hereby gives notice to the defendant
charged in Counts 34 through 45 that, upon his conviction of any
such offense, the government will seek forfeiture in accordance
with Title 18, United States Code, Section 982, of all property
involved in each offense of conviction in violation of Title 18,
United States Code, Section 1957, and all property traceable to
such property, including but not limited to:

(a) a sum of money equal to at least $200 million
in United States currency;

(b) approximately $822,091.76 previously on
deposit at TD Bank account number 7864181297, and related
accounts, held in the name of Action Holdings;

(c)    approximately $13,348.13 previously on
deposit at Bank of America account number 381022014968 held in
the name of Citadel Investments;

(d) approximately $1,589.43 previously on deposit
at Bank of America account number 381020694762 held in the name
of Rivka Bichler;

(e) approximately $11.72 previously on deposit at

- 48 -

Bank of America account number 381022014971 held in the name of E
& R Developers LLC;

(f)   approximately $32,385.86 previously on
deposit at Provident Bank account number 601213474 held in the
name of Watch Hill Funding LLC;

(g)   approximately $984.51 previously on deposit
at Provident Bank account number 832600555 held in the name of
Watch Hill Funding LLC;

(h)   approximately $228.59 previously on deposit
at Wachovia Bank account number 31201467 held in the name of
Chaya Riki Epstein;

(i)   approximately 81 pieces of jewelry seized on
or about August 12, 2010, from the residence located at 596 Seton
Circle, Lakewood, New Jersey;

(j)   approximately 9 items of Judaica art seized on
or about August 12, 2010, from the residence located at 596 Seton
Circle, Lakewood, New Jersey.

3.   If any of the above-described forfeitable property, as
a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due
diligence;

(b)   has been transferred or sold to, or deposited
with, a third party;

(c)   has been placed beyond the jurisdiction of

- 49 -

the court;

        (d)   has been substantially diminished in value; or

        (e)   has been commingled with other property which

cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982, to seek forfeiture of any other

property of the defendant up to the value of the forfeitable

property described in paragraph 2.


                      A TRUE BILL

                        FOREPERSON


PAUL J. FISHMAN
UNITED STATES ATTORNEY

CASE NUMBER:2009R00421

# United States District Court

## District of New Jersey

UNITED STATES OF AMERICA

v.

ELIYAHU WEINSTEIN,

a/k/a "Eli Weinstein,"

a/k/a "Edward Weinstein,"

a/k/a "Eddie Weinstein"

and

VLADIMIR SIFOROV

# INDICTMENT FOR

18 U.S.C. §§ 1349; 1344; 1343; 1957 & 2

A True Bill,



PAUL J. FISHMAN

*UNITED STATES ATTORNEY*

*NEWARK, NEW JERSEY*

ZACH INTRATER & GURBIR GREWAL

ASSISTANT U.S. ATTORNEYS

(973) 645-2728/2931