UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


UNITED STATES OF AMERICA          :          Crim. No. 11-701 (JAP)

               v.                          :

ELIYAHU WEINSTEIN,                :          Hon. Joel A. Pisano
      a/k/a "Eli Weinstein,"
      a/k/a "Edward Weinstein,"        :
      a/k/a "Eddie Weinstein"

---

MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO
DEFENDANT'S PRETRIAL MOTIONS

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Suite 700
Newark, New Jersey 07102
(973) 645-2700

On the Brief:
Rachael A. Honig
Gurbir S. Grewal
Zach Intrater
Assistant United States Attorneys

# TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    **Defendant's Motion to Compel the United States to Produce Discovery Should Be Denied As Moot In Most Respects, and Denied As Without Basis In Law In Others**. . . . . . . . . . . . . . . . . 7

        A.    **Defendant Is Not Entitled to Receive the Grand Jury Testimony of "Any Witnesses Who Testified In the Grand Jury Proceedings That Resulted in the Indictment Against Him"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.    **The United States Has Complied and Will Continue to Comply With Its <u>Brady</u> Obligations**. . . . . . . . . . . . . . . . . . 9

        C.    **The United States Will Comply With Its <u>Giglio</u> Obligations, Including Regarding Impeachment Material, If Any, Contained In Agents' Personnel Files**. . . . . . . . . . . . . . . . . 9

        D.    **The United States Will Preserve Agents' Rough Notes**. . . 13

        E.    **The United States Will Make Its Marked Trial Exhibits, Including Recordings and Transcripts, Available On or Before December 7, 2012**. . . . . . . . . . . . . . . . . . . . . . . . . . 14

        F.    **The United States Will Make Timely Rule 16(a)(1)(G) Disclosures Should It Decide to Call Expert Witnesses At Trial**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        G.    **The United States Will Provide Notice Regarding Rule 404(b) Evidence As Provided in the Court's Discovery**

    **Order**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

 II. **Defendant's Motion to Preclude the Admission of Non-Original Documents Must be Denied**. . . . . . . . . . . . . . . . . . . . . . 17

 III. **Defendant's Motion to Strike Language From the Indictment Must Be Denied**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   A. **Defendant's Aliases Are Relevant and Admissible**. . . . . . . 20

   B. **The United States Does Not Object to Redacting the Indictment to Refer to Co-Defendant Siforov as a Co-Conspirator**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

 IV. **A Bill of Particulars Is Not Necessary**. . . . . . . . . . . . . . . . . . 24

 V. **Defendant's Motion to Dismiss the Indictment Based on Alleged Duplicity and Misjoinder Must Be Denied**. . . . . . . . . . . . . . . . . 26

   A. **Count One Is Not Duplicitous**. . . . . . . . . . . . . . . . . . . . 26

   B. **The Individual Counts in the Indictment Are Properly Joined**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

 VI. **Defendant Should Not Be Permitted to File Additional Pretrial Motions Without First Obtaining Leave of the Court**. . . . . . . . . 36

 VII. **Defendant Is Obligated to Provide Reciprocal Discovery**. . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## PRELIMINARY STATEMENT

The United States submits this memorandum of law in response to the pretrial motions submitted by defendant Eliyahu Weinstein (hereinafter "defendant"). The United States respectfully reserves its right to supplement its response by oral argument.

## BACKGROUND

The Indictment charges that between 2004 and 2011, defendant orchestrated a massive scheme to defraud numerous victims out of hundreds of millions of dollars. Although defendant represented to these victims that their money would go towards specific transactions, usually investments in real estate, defendant and others diverted the majority of this money, and spent it on many things – but never in the manner represented to their victims.

According to the Indictment, defendant made numerous types of material misrepresentations and misleading statements to carry out the fraud. Indictment, Count 1, ¶ 3. At first, defendant targeted his victims using his connections in the Orthodox Jewish community. Id., Count 1, ¶ 5. Sometimes, defendant and his co-conspirators told his victims that he had inside access to certain real estate investment opportunities, and solicited investments in order to buy the properties and quickly "flip" them for a large profit. Id., Count 1, ¶¶ 3(a),

-1-

(d).  On other occasions, defendant and his co-conspirators told victims that he owned specific interests in real estate properties, and would sell the victim the defendant's interest.  Id., Count 1, ¶¶ 3(d), 28-29.  From yet other victims, defendant and his co-conspirators sought short-term "bridge" loans to allegedly facilitate thepurchase of a property, which loans the defendant and his co-conspirators claimed they would pay back, with interest, in just days or weeks – and which loans, they assured victims, would be secured by defendant's interests in other properties he owned.  Id., Count 1, ¶¶ 34, 55-57.  Defendant and his co-conspirators induced yet other victims with promises that their funds would be held in escrow until the closing of the transaction, id., Count 1, ¶¶ 3(e), 61(e); and, after closing, profits could be "rolled over" into yet new deals, id., Count 1, ¶ 3(g).

But, the Indictment alleges, these representations were lies – lies that defendant and his co-conspirators backed up with a host of fraudulent documents that they created or caused to be created.  Id., Count 1, ¶ 4.  To certain victims, defendant and his co-conspirators gave "show checks," leading the victims to believe that their money had invested in specific transactions, when in reality it had not.  Id., Count 1, ¶ 4(a).  Defendant and his co-conspirators simply forged other checks, which had originally been negotiated for small amounts, but which they altered or caused to be altered so as to appear worth millions of dollars.  Id.,

Count 1, ¶ 4(b).  Defendant and his co-conspirators also provided victims with phony operating agreements, purporting to show the defendant's or a co-conspirator's interest in properties; fake leases, supposedly showing rental income (which in fact didn't exist); and mortgages and deeds, which could not provide the collateral defendant and his co-conspirators claimed they did, because defendant had previously mortgaged or handed over any real interest in the properties that he may once have had.  Id., Count 1, ¶¶ 4(c),(e)-(f).

Just a couple of examples will illustrate the pattern.  From in or about May 2007 through in or about October 2007, defendant and his co-conspirators defrauded "M.F.", a member of the Orthodox Jewish community who resided in the United Kingdom, out of approximately $6.5 million in connection with purported real estate transactions.  On one occasion, defendant and his co-conspirators presented M.F. with a share sale agreement showing that defendant had an agreement to sell a building in Brooklyn, New York.  According to the share sale agreement, defendant's entity owned the Brooklyn property, and was to sell the property for $16.2 million to a "Siforov, Inc."  Unbeknownst to M.F., however, the principal of Siforov, Inc. was co-conspirator Vladimir Siforov, who had no intention to purchase the building.  (Indeed, defendant's entity did not even own the building outright – defendant had defrauded earlier victims into providing

-3-

loans so that he could acquire it.)  Based on the sham agreement, M.F. wired approximately $4.8 million to defendant for an 80% stake in BEG.

Thereafter, to prove the deal had closed and to solicit yet more money from M.F., defendant caused a fax of a forged cashier's check, purportedly in the amount of approximately $9.9 million – the alleged proceeds of the transaction – to be sent to M.F. in the United Kingdom.   In reality, however, the forged cashier's check had been issued years earlier, for only $260,000, to a different person.  Based on the forged check, M.F. wired approximately $1.695 million to defendant, which was never repaid.

In the case of victim "R.B.S." – a widowed retiree residing in Los Angeles, California, who worked to assist orphans in Israel – defendant and his co-conspirators solicited approximately $1.2 million from R.B.S for a supposed short-term real estate investment.  To induce R.B.S., defendant pledged as collateral his interests in three New Jersey properties; in fact, however, defendant did not possess any real interest in those properties.  Indeed, the pledged properties were either fraudulently obtained, pledged to others, or already foreclosed upon at the time defendant personally pledged them to R.B.S. Moreover, R.B.S.'s investment was used to pay prior victims and for the personal expenses of defendant and his co-conspirators, and not to purchase any real estate.

-4-

Although defendant and his co-conspirators first targeted members of the Orthodox Jewish community, the Indictment alleges that by 2010 he had worn out his welcome with such victims, because of the huge losses his fraudulent scheme had caused. Id., Count 1, ¶ 7. Therefore, beginning in or around April 2010, defendant and his co-conspirators began to solicit victims from outside the Orthodox Jewish community, and proceeded to defraud these later victims out of additional millions of dollars. Id., Count 1, ¶ 60. To the later victims, defendant and his co-conspirators claimed, among other things, that defendant had inside connections with other members of the Orthodox Jewish community could help identify real estate that was selling for attractive prices in the wake of the Great Recession. Id., Count 1, ¶ 61(a). Defendant and his co-conspirators asserted that defendant had lined up purchasers for these properties, and so, with the later victims' money, could flip the properties in short order. Id., Count 1, ¶ 61(c). Between April 2010 and August 2010, defendant and his co-conspirators solicited at least $8 million from victims outside the Orthodox Jewish community. In all cases, none of these victims' investments were used for the stated real estate transactions. Instead, defendant and his co-conspirators used these victims' funds to pay their personal expenses and salaries, to repay prior victims of the scheme, and in some cases to make small, lulling payments to victims themselves to

continue the fraud.

The Indictment alleges that, although the particular misrepresentations and omissions varied according to the victim and according to the sham transaction, defendant and his co-conspirators solicited approximately $200 million from their victims. They then diverted material portions of victims' money to their own ends, without disclosing these diversions of funds to the victims. <u>Id.</u>, Count 1, ¶ 8. Defendant used some of his victims' funds for other, unrelated transactions. <u>Id.</u>, Count 1, ¶ 8(a). He used some funds to pay prior victims. <u>Id.</u>, Count 1, ¶ 8(b). He used some funds to make "lulling" payments, so that victims would not think that anything was amiss. <u>Id.</u>, Count 1, ¶ 8(c). And he spent millions of dollars for his own uses, including lavish sums on jewelry, artwork, gambling, and credit card payments, and millions of dollars in attorneys' fees. <u>Id.</u>, Count 1, ¶¶ 8(e), (f).

Defendant was arrested on or about August 12, 2010, and charged with one count of bank fraud, in violation of 18 U.S.C. § 1344, and one count of wire fraud, in violation of 18 U.S.C. § 1343.

On or about October 27, 2011, a grand jury handed up the present Indictment, which charges defendant with one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349; twenty-nine counts of wire fraud, in violation of 18

U.S.C. § 1343; one count of bank fraud, in violation of 18 U.S.C. § 1344; two counts of wire fraud while on pretrial release, in violation of 18 U.S.C. §§ 1343 and 3147; and twelve counts of money laundering, in violation of 18 U.S.C. § 1957.  Trial is set for January 7, 2012.

## ARGUMENT

I.       **Defendant's Motion to Compel the United States to Produce Discovery Should Be Denied As Moot In Most Respects, and Denied As Without Basis In Law In Others**

Defendant moves for an order requiring the government to comply with its discovery obligations, including those imposed by Federal Rule of Criminal Procedure 16 and the Court's own Discovery Order in this case.  On or about November 15, 2011, this Court entered a Complex Case Order.  As stated on the record during a hearing on or about November 15, 2011, and as reiterated in each of the government's discovery letters, discovery in this case has been provided on a rolling basis.  Accordingly, the government represents that it already has complied with its obligations and that it will continue to do so as required by law.  Defendant's discovery motion thus primarily should be denied as moot.  In certain instances — discussed in greater detail below — defendant's demands far exceed anything that the law would permit.  In those respects, his motion regarding discovery must simply be denied.

**A.    Defendant Is Not Entitled to Receive the Grand Jury Testimony of "Any Witnesses Who Testified In the Grand Jury Proceedings That Resulted in the Indictment Against Him"**

Defendant seeks to compel the United States to disclose "the grand jury testimony of any witnesses who testified in the grand jury proceedings that resulted in the indictment against him." Defendant Eliyahu Weinstein's Brief in Support of Pretrial Motions ("Def. Br.") at 3. To the extent these witnesses testify at trial, he is entitled to receive this material under the Jencks Act, and it will be provided to him. Defendant apparently seeks the grand jury testimony of non-testifying witnesses as well, however. He is not entitled to it, and his motion should be denied.

The secrecy of grand jury proceedings is protected by Rule 6(e) of the Federal Rules of Criminal Procedure, and while Rule 6(e)(3)(E) permits a court to authorize disclosure of grand jury matters, it may do so only upon a showing of a "particularized need" that outweighs the public interest in grand jury secrecy. In demonstrating a particularized need, "mere speculation that improprieties may have occurred will not suffice." United States v. Budzanoski, 462 F.2d 443, 454 (3d Cir. 1972). Instead, discovery regarding grand jury proceedings is appropriate only "upon a showing of [a] substantial likelihood of gross or prejudicial

irregularities in the conduct of the grand jury." Id.  Defendant's sole apparent

basis for seeking the grand jury testimony of witnesses who do not testify at trial is

the claim that "review of this testimony could lead to the request for an adverse

inference jury instruction if not all witnesses are also called at trial."  Def. Br. at 3.

This falls well short of a showing of "particularized need" and does not begin to

establish a "substantial likelihood of gross or prejudicial irregularities."  His

motion must be denied.

> **B.    The United States Has Complied and Will Continue to Comply With Its <u>Brady</u> Obligations**

Defendant moves for the disclosure of evidence favorable to him or

unfavorable to the government.  The government is cognizant of its obligations

pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and is aware of no <u>Brady</u>

information requiring disclosure.  Should any additional information come to light

in the future, the government will make prompt disclosure to the defense.

> **C.    The United States Will Comply With Its <u>Giglio</u> Obligations, Including Regarding Impeachment Material, If Any, Contained In Agents' Personnel Files**

Defendant seeks the disclosure, "as early as possible" of "any

impeachment material pertaining to any witnesses in this case."  Def. Br. at 7.  The

government is fully aware of its obligations to disclose evidence that may be used

to impeach the credibility of government witnesses.  See Giglio v. United States, 405 U.S. 150, 154 (1972).  Disclosure of evidence that may be used to discredit government witnesses is not directly exculpatory, however, and therefore need not be disclosed well in advance of trial.  The Third Circuit held in United States v. Higgs, 713 F.2d 39, 42 (3d Cir. 1983), that disclosure of Giglio material on the day that the witness in question testifies sufficiently insures a defendant's right to a fair trial, stating:

> The Brady material in this case was information that [the defendant] could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think [the defendant's] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses.

Id. at 448.  Consistent with this view, federal courts routinely have refused to order pretrial production of Giglio materials.  See, e.g., United States v. Martino, 648 F.2d 367, 384 (5th Cir. 1981) (en banc) (evidence concerning competency of key government witness provided at time he testified); United States v. Rinn, 586 F.2d 113, 119 (9th Cir. 1978); United States v. Giffen, 379 F. Supp. 2d 337, 347 (S.D.N.Y. 2004); United States v. Earls, 2004 WL 350725, *8 (S.D.N.Y. Feb. 25, 2004); United States v. Giampa, 904 F. Supp. 235, 281-82 (D.N.J. 1995); see also

Hemphill v. United States, 393 U.S. 877 (1968).

In a case such as this, where there are no special circumstances requiring early disclosure of impeachment material, the only apparent need for pretrial disclosure is to learn the identity of government witnesses through the "back door." The Third Circuit and other courts have repeatedly held that requests for discovery cannot properly be used to obtain a list of government witnesses. See Government of the Virgin Islands v. Ventura, 476 F.2d 780 n.1 (3d Cir. 1973); United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971); United States v. Cole, 449 F.2d 194, 198 (8th Cir. 1971). As one court noted, it "follows that if [a] court would not order [pretrial] production of a list of the government's witnesses, it would not order production of their criminal records, if any." United States v. Westmoreland, 41 F.R.D. 419, 427 (S.D. Ind. 1967).

While there is no provision for early production of Giglio material, the United States proposes to provide such material, to the extent it exists, when it provides Jencks Act material to the defense — no later than the Friday before the government begins its case in chief. Disclosure in this manner will be more than adequate to afford defense counsel time to prepare for cross-examination, to prevent unnecessary delays in the trial, and to satisfy the defendant's due process rights. See Higgs, 713 F.2d at 44; United States v. Kubiak, 704 F.2d 1545,

-11-

1549-50 (11th Cir. 1983); United States v. Kopituk, 690 F.2d 1289, 1337-41 &

n.47 (11th Cir. 1982); see also United States v. Starusko, 729 F.2d 256, 261 (3d

Cir. 1984)  (encouraging the early production of Brady and Giglio materials).

Accordingly, the Court should deny the defendant's motion for early disclosure of

impeachment materials.

    Defendant also seeks an order requiring the United States to review

the personnel files of all agents expected to testify, citing United States v.

Henthorn, 931 F.2d 29, 30 (9th Cir. 1990), and asks that the government submit to

the Court any materials as to which it is "uncertain" whether the materials should

be disclosed as Giglio.  The government already has a procedure in place

according to which agency files pertaining to testifying law enforcement agents

will be reviewed by the relevant agency for Giglio material.  The agency will then

inform the prosecution team of the results.  Any material that qualifies as Giglio

will be disclosed to the defendant, and the government will seek the Court's

guidance as necessary if the nature of any particular material is in doubt.

Defendant's motion, therefore, should be denied as moot.  See United States v.

Dent, 149 F.3d 180, 191 (3d Cir. 1998) (approving Giglio review procedure

described above); United States v. Karriem, 2008 WL 5118200, *11-12 (D.N.J.

Dec. 4, 2008) (Ackerman, J.) (refusing to order in camera review of law

enforcement personnel files and holding that "[p]rosecutorial review of potential Brady material ordinarily is sufficient absent some exceptional circumstances").

Defendant further requests that the Court order the government to "provide[] information" about "certain individuals [who] are not presented as witnesses" so that defendant can "determine, for instance, whether an adverse instruction is in order or whether that participating officer has certain characteristics that might have impacted his/her actions in this case." Def. Br. at 6. Even assuming that the government could determine who these "certain individuals" were and what those "certain characteristics" might be, defendant cites no case holding that the government is obligated to disclose Giglio material regarding non-testifying law enforcement agents. Defendant's motion should be denied in this respect as without basis in law.

### D.    The United States Will Preserve Agents' Rough Notes

Defendant moves for an order requiring that the United States retain, preserve and produce agents' rough notes. The United States is aware of its obligation to preserve and retain the notes of law enforcement agents, pursuant to United States v. Vella, 562 F.2d 275, 276 (3d Cir. 1977). The United States will therefore direct its agents to preserve any rough notes that may exist. To the extent that these notes or records are Jencks Act or Giglio materials, they will be

-13-

disclosed to defendant  when all Jencks and <u>Giglio</u> materials are disclosed.

Defendant's motion should be denied as moot.

> **E.    The United States Will Make Its Marked Trial Exhibits, Including Recordings and Transcripts, Available On or Before December 7, 2012**

Defendant requests that the United States make available its trial exhibits thirty days before the trial date, as provided in the Court's Discovery Order.  The government will comply with the order, and intends to make its exhibits available on or before December 7, 2012.  Defendant also separately moves for an order compelling the government to "identify the recordings it intends to use at trial," and make available transcripts and/or translations of those recordings, thirty days before trial.  Def. Br. at 9.  To the extent the government intends to use recordings, transcripts, and/or translations in its case-in-chief at trial, these items will be among the exhibits made available on or before December 7, 2012, and defendant's motions should be denied as moot.

The United States of course may use exhibits that have not previously been marked in order to cross-examine defense witnesses or as part of a rebuttal case, and further reserves its right to mark and disclose additional trial exhibits after December 7 in the course of its continuing preparation for trial.  The government expects that defendant will reserve his right to do likewise.

-14-

**F.    The United States Will Make Timely Rule 16(a)(1)(G) Disclosures Should It Decide to Call Expert Witnesses At Trial**

Federal Rule of Criminal Procedure 16(a)(1)(G) provides that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rule of Evidence during its case-in-chief at trial."  Rule 16(b)(1)(C) requires the defendant to make similar disclosures to the government.

The government has not received any Rule 16 disclosures from the defendant to date.  Likewise, the government has not yet decided whether to offer expert or other specialized or technical testimony at trial.  Should the government decide that it will offer such testimony, it will make all necessary disclosures in sufficient time for defendant to prepare to cross-examine these witnesses at trial.

**G.    The United States Will Provide Notice Regarding Rule 404(b) Evidence As Provided in the Court's Discovery Order**

Defendant moves for an order compelling the United States to give notice to defendant "immediately" regarding whether it intends to seek the admission of any "other act" evidence pursuant to Federal Rule of Evidence 404(b).  The Court's Discovery Order requires the government to provide notice to the defendant ten days before trial if it intends to seek the admission of such

-15-

evidence.  The government will comply with this Order, while specifically reserving its right to seek to introduce evidence governed by Rule 404(b) during the trial, without having first given notice to the defendant, upon a showing of good cause that is satisfactory to this Court.

Defendant does not explain why two weeks' notice is insufficient to allow him to prepare to counter such evidence, if any, or to brief the admissibility of the evidence for the Court.  Moreover, at this point, the government has made no determination as to whether it will seek to introduce any evidence pursuant to Rule 404(b), and will not make that determination until much closer to the date of the trial.  Defendant's motion should be denied.

**II.**      **Defendant's Motion to Preclude the Admission of Non-Original Documents Must be Denied**

Citing Federal Rule of Evidence 1002, defendant purports to object to the "introduction of any non-original document at trial," and claims that this blanket objection means that "the Government must be required to produce original documents when presenting its case." Def. Br. at 10. This is incorrect. According to Federal Rule of Evidence 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a <u>genuine</u> question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." (Emphasis added.) Defendant neither identifies the specific documents whose authenticity he plans to challenge, nor states any basis whatsoever – genuine or otherwise – for such a challenge.

Under Rule 1003, it is the party who opposes the introduction of a document who bears the burden of proving that the document is not what it purports to be. <u>See</u> <u>United States v. Georgalis</u>, 631 F.2d 1199, 1205-06 (5th Cir. 1980) ("A duplicate may be admitted into evidence unless opposing counsel meets the burden of showing that there is a genuine issue as to the authenticity of the unintroduced original, or as to the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original."). A broad assertion that

-17-

defendant intends to challenge the authenticity of vast classes of documents is not a sufficient rationale for requiring the government to introduce only original documents at trial.  Instead, there must be some colorable claim that a specific duplicate has been in some way altered from its original form.  Defendant apparently intends to claim that he did not sign particular checks or documents that appear to bear his signature, but this is not a claim that a duplicate has been modified from its original – it is a claim that the original itself was forged. Assuming, for the sake of argument, that there will be any evidence to support this claim, such a claim goes to weight, not to admissibility.  See, for example, United States v. Reich, 2005 WL 1388967, *2-3 (E.D.N.Y. June 10, 2005).   Defendant's motion must be denied.

III.     **Defendant's Motion to Strike Language From the Indictment Must Be Denied**

Federal Rule of Criminal Procedure 7(d) permits a court, on motion of the defendant, to strike surplusage from an indictment where such surplusage is *both* irrelevant to the offenses charged and prejudicial to the defendant.  See United States v. Hedgepeth, 434 F.3d 609, 611 (3d Cir. 2006).  Such motions are rarely granted.  See id.  This is so because an indictment is not limited to a bare recitation of the essential elements of the charged offense.  Rather, it may contain other language that is "relevant in a general sense to the overall scheme alleged in the indictment," as well as language "relevant to evidence that the government will present at trial."  United States v. Caruso, 948 F. Supp. 382, 392 (D.N.J. 1996); see also United States v. Giampa, 904 F. Supp. 235, 271-72 (D.N.J. 1995).

Each of the items that defendant identifies as alleged "surplusage" is in fact relevant to the offenses charged in the Indictment.  Therefore, the Court need not determine whether they are "prejudicial."  See Hedgepeth, 434 F.3d at 609 ("[I]nformation that is prejudicial, ret relevant to the indictment, must be included . . . ."); United States v. Moss, 9 F.3d 543, 550 (6th Cir. 1993) ("[I]f the language in the indictment is information which the government hopes to prove at trial, it cannot be considered surplusage no matter how prejudicial it may be

-19-

(provided, of course, it is legally relevant).") (citation and internal punctuation omitted); <u>United States v. Scarpa</u>, 913 F.2d 993, 1013 (2d Cir. 1990) ("If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.") (citation and internal punctuation omitted).

### A.    Defendant's Aliases Are Relevant and Admissible

Defendant moves to strike his aliases from the Indictment.  The Third Circuit has held that "[t]he inclusion of an alias in the indictment, even one with strong negative connotations, is permissible if it is needed to connect the accused to the acts charged."  <u>United States v. Vastola</u>, 899 F.2d 211, 232 (3d Cir.), rev'd on other grounds, 497 U.S. 1001 (1990).  Defendant's aliases — "Eli Weinstein," "Edward Weinstein," and "Eddie Weinstein" — are not remotely prejudicial, nor do they have negative connotations.  More importantly, they are relevant and will be admissible at trial, as the evidence will show that defendant used these monikers in his dealings with the victims of his scheme.

### B.    The United States Does Not Object to Redacting the Indictment to Refer to Co-Defendant Siforov as a Co-Conspirator

The government does not agree that the presence of defendant's co-defendant, Vladimir Siforov, in the Indictment constitutes prejudicial surplusage.

-20-

As Siforov is a fugitive and will not be tried with defendant, however, the government has no objection to redacting the Indictment for purposes of trial to refer to Siforov as a co-conspirator rather than a co-defendant.

### C.    The "Truth and Fact" Of the Matters Alleged In the Indictment is Relevant and Admissible to Prove Falsity

Defendant moves to strike the phrase "in truth and in fact" in Count One of the Indictment, arguing that "[t]he truth and fact of what happened is for the jury to determine."  Def. Br. at 11.  (Indeed, that is true of all of the allegations in the Indictment.)  In Count One, defendant is charged with conspiring to use wire communications to execute a scheme to defraud and to obtain money and property by means of materially false pretenses, representations, or promises.  To prove the material falsity of defendant's statements, representations, and promises, proof of the truth of the matter is of course highly probative — bordering on necessary.  The language thus cannot be stricken as surplusage.

### D.    The Phrase "Lulling Payments" is Relevant and Admissible

Defendant objects to the description "lulling payments," applied to small payments made "to gain victims' trust."  Def. Br. at 12.  It is relevant and admissible that defendant made payments to victims in order to "lull" them into inactivity and prevent his fraud from being earlier discovered, and this language is

-21-

not particularly negative or inflammatory.  It, therefore, cannot be stricken as surplusage.  See United States v. Hecker, 2010 WL 3463393, *5 (D. Minn. July 6, 2010) (refusing to strike allegations regarding "lulling communications" as prejudicial surplusage).

> **E.    Evidence of the Use of Victim Investments to Pay Defendant's Personal Legal Bills is Relevant and Admissible**

Defendant asks the Court to strike from the Indictment the allegation that, rather than using victims' funds as he had promised them, defendant instead used the money to pay personal legal bills.  Def. Br. at 12.  Proof that the defendant used fraudulently-obtained funds for inherently personal expenses such as legal bills – and not for the purposes he cited to victim investors – is strongly probative of defendant's motive and intent.  This allegation thus cannot be stricken from the Indictment.  Defendant speculates that the jury "may assume . . . that Mr. Weinstein paid his current legal counsel with illicit funds."  Def. Br. at 12.  If this materializes as a concern at trial, the government would have no objection to an appropriate jury instruction.

> **F.    Evidence of Victim Characteristics Is Relevant and Admissible**

Finally, defendant seeks to strike two allegations regarding victim

-22-

characteristics: (1) the allegation that victim R.B.S. was a widow who worked to assist orphaned and poor children in Israel; and (2) the allegation that victim J.C. managed investments for a charitable organization dedicated to helping underprivileged children in New York City.  As with most witnesses, when these individuals testify at trial, they will provide some background for their testimony, including regarding their employment and personal characteristics; presumably the Court would not bar them from so testifying.  Moreover, these characteristics are not "irrelevant," as defendant claims.  The witnesses' employment and personal circumstances are relevant to show why defendant selected them as his victims; how he approached them and solicited them to participate in his fraudulent investment scheme; the reasons they agreed to invest their money with defendant; and, in the case of R.B.S., her particular vulnerability to defendant's misrepresentations.  These allegations cannot be stricken from the Indictment, and defendant's motion must be denied.

**IV.          A Bill of Particulars Is Not Necessary**

Defendant moves for a bill of particulars, which the Third Circuit has described as a "formal, detailed statement of the claims or charges brought by a . . . prosecutor." United States v. Urban, 404 F.3d 754, 771 (3d Cir. 2005). "The purpose of a bill of particulars is 'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.'" Id. at 772 (quoting United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971)). A bill of particulars should only be ordered where the indictment itself "fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" Id. (quoting United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989)). A bill of particulars is not an investigative vehicle for the defense, nor is it a discovery tool to obtain disclosure of the government's case prior to trial. See United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) ("Acquisition of evidentiary detail is not the function of the bill of particulars.") (quoting United States v. Hemphill, 392 F.2d 45, 49 (8th Cir. 1968)). Rather, the bill is "intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation." United

-24-

States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985).  If the defendant can derive

this information from the indictment and the discovery provided, there is no need

for the bill to issue.  See United States v. Eisenberg, 773 F. Supp. 662, 689-92

(D.N.J. 1991).

        Defendant's request for a bill of particulars seeks two categories of

information: (1) copies of specific fraudulent documents, referred to in the

Indictment by description; and (2) the identification of certain real estate

properties or projects.  Defendant has previously requested this information from

the government, and on or about October 26, 2012, the government willingly

complied, providing defendant with copies of all of the documents and identifying

the real estate properties and projects in question.  No bill of particulars is

therefore necessary.  See United States v. Drivas, 2012 WL 3011023, *3

(E.D.N.Y. July 19, 2012) (holding that information regarding specific fraudulent

documents and claims " need not be set forth in a bill of particulars where the

Government has made sufficient disclosures by other means") (citation and

punctuation omitted).

**V.**        **Defendant's Motion to Dismiss the Indictment Based on Alleged Duplicity and Misjoinder Must Be Denied**

Defendant moves to dismiss the entire Indictment, on the basis that Count One charges multiple conspiracies and is therefore "duplicitous" and that the remaining counts are misjoined.  Def. Br. at 16.  As an initial matter, the United States notes that neither claim — even if well-founded — would justify dismissal of the Indictment before trial.  A duplicitous count may be dismissed, but the court may also give the government the option of making an election as to on which offense it intends to proceed.  Counts that have been misjoined must be tried separately, not dismissed.

More importantly, however, defendant is simply wrong.  Count One charges a single offense and is not duplicitous, and Counts Two through Forty-Five are properly joined.  Defendant's motion must be denied.

**A.        Count One Is Not Duplicitous**

Defendant seeks to dismiss Count One, the Indictment's conspiracy count, arguing that it charges multiple conspiracies in a single count and is therefore "duplicitous."  As defendant apparently recognizes in a footnote, however, his argument conflates the standard for assessing whether a single count is duplicitous because it charges the violation of two different statutory offenses

-26-

with the entirely separate standard — originating from the Supreme Court's

decision in Kotteakos v. United States, 892 F.2d 255, 258 (1946) — that applies to

a post-trial claim that the government's proof at trial varied from the indictment by

establishing multiple conspiracies rather than the single conspiracy charged. This

distinction is not merely academic. The Third Circuit held in United States v.

Donsky, 825 F.2d 746, 751-52 (1987), that it is error for a district court to grant a

pre- or (even mid-) trial motion to dismiss an indictment that charges a single

conspiracy "unless the prosecution has made a clear and deliberate concession

which must necessarily prevent a conviction" on a single conspiracy count. See

also United States v. DeLaurentis, 230 F.3d 659, 661 (3d Cir. 2000) ("Unless there

is a stipulated record, or unless immunity issues are implicated, a pretrial motion

to dismiss an indictment is not a permissible vehicle for addressing the sufficiency

of the government's evidence."). In this case, the government has alleged a single

conspiracy in the Indictment, and the government is entitled to prove it. See

Donsky, 825 F.2d at 754 (holding that even though the government made certain

"concessions" in its opening statement, district court erred in granting motion to

dismiss on Kotteakos grounds because those concessions failed to "establish as a

matter of law that a single conspiracy could not be proven"); United States v.

Sourlis, 953 F.Supp. 568, 573 (D.N.J. 1996) (Ackerman, J.) (recognizing that it is

premature to take up <u>Kotteakos</u> arguments pre-trial); <u>United States v. Clarke</u>, 2008 WL 2228991, *9 (E.D.N.Y. May 28, 2008) ("The <u>Kotteakos</u> decision provides no support . . . for the notion that the potential for a variance of proof at trial serves as grounds for dismissing an indictment before trial."). Defendant's motion must be denied.

Defendant does not cite <u>Donsky</u> in his brief, nor does he cite a single case in which a court has dismissed a single conspiracy count, pre-trial, on the grounds that the count charged multiple conspiracies as a matter of fact. <u>United States v. Rigas</u>, 605 F.3d 194 (3d Cir. 2010), upon which defendant heavily relies, involved a double jeopardy challenge brought by defendants who had been previously charged and convicted in New York and were now being prosecuted in Pennsylvania for what they claimed was the same offense. The New York indictment charged a conspiracy to commit an offense against the United States under 18 U.S.C. § 371, while the Pennsylvania indictment charged a conspiracy to defraud the United States under the same statute. In analyzing whether the statute contemplated multiple offenses or merely alternative means of committing the same offense, the court examined cases holding that a single Section 371 count is not duplicitous even if it charges both prongs of the statute, and remanded so that the government could attempt to establish, by a preponderance of the evidence,

-28-

"that the Rigases entered into two separate agreements."  605 F.3d at 217.  Here, the government has not alleged that defendant entered into two separate agreements based on two different prongs of the statute charged.  The government instead has alleged a single conspiracy based on a single statute.  <u>Rigas</u>, therefore, does not apply.  Nor do <u>Kotteakos</u>, and its progeny, all of which are variance cases arising post-trial, not cases involving pre-trial claims of duplicity.  While defendant claims that it "is better to recognize and eliminate [a variance problem] now that after a lengthy trial," Def. Br. at 18, as <u>Donsky</u> and other cases make clear, there can be no variance problem until there has been a trial.  <u>See</u> <u>United States v. Wright</u>, 2012 WL 3778986, *6 (E.D. Tenn. June 19, 2012) ("[T]he Court finds that the issue of a fatal [<u>Kotteakos</u>] variance is not one that can be decided before the trial of the matter."); <u>Clarke</u>, 2008 WL 2228991, *9 (holding that <u>Kotteakos</u> claim could not be made until "after the presentation of the government's case at trial"); <u>United States v. Dioguardi</u>, 20 F.R.D. 10, 15 (S.D.N.Y. 1956) (same).  Defendant's arguments will have to wait until such time, if it ever comes, as they are necessary and appropriate.

-29-

### B.    The Individual Counts in the Indictment Are Properly Joined

Almost as an afterthought, defendant adds to his argument that Count One is impermissibly duplicitous the claim that "the remaining substantive counts in the Indictment, which flow directly from these same unrelated transactions laid out in Count One, are misjoined in the Indictment for the same reasons."  Def. Br. at 21.  Defendant does not explain which substantive counts are misjoined to which other substantive counts, apparently suggesting that the Court should hold 45 individual trials in this matter.  This is, of course, absurd and utterly unsupported by the law.  See United States v. Niederberger, 580 F.2d 63, 66-67 (3d Cir. 1978) ("The obvious purpose of Rule 8(a)'s liberal joinder provision is to promote judicial and prosecutorial economy by the avoidance of multiple trials.").

Federal Rule of Criminal Procedure 8(a) provides that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute part of a common scheme or plan."  The rule strongly favors joinder, and courts thus have defined the term "transaction" "very flexibly, as implying a connection of logical relationship rather than immediateness."  United States v. LaRouche, 896 F.2d 815, 830 n.5 (4th Cir.

-30-

1990).  "Regardless of whether both sets of charges involve the presentation of the same evidence, the fact that one illegal activity provides the impetus for the other illegal activity is sufficient to constitute a common scheme for joinder purposes." United States v. Dominguez, 226 F.3d 1235, 1239 (11th Cir. 2000).  Likewise, separate offenses may be charged in one indictment so long as they are "of like class, even if they are not temporally or evidentially linked." United States v. Alexander, 135 F.3d 470, 476 (7th Cir. 1998) (citation and punctuation omitted); see also United States v. Gooch, 665 F.3d 1318, (D.C. Cir. 2012) ("As long as only one defendant is concerned, Rule 8(a) permits joinder of [offenses of a same or similar character], even if they are entirely unrelated to each other."); United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002).

   In this case, Count One charges defendant with conspiring to commit wire fraud and Counts Two through Thirty charge him with carrying out that conspiracy by in fact committing wire fraud.  This is more than sufficient to show that the offenses charged in these counts are "similar to" to one another, "based on the same act or transaction," and "part of a common scheme or plan," where any one of these reasons standing alone would be a sufficient basis for finding those counts to be properly joined in the same indictment.   Counts Thirty-One and Thirty-Two charge defendant with executing the scheme in two additional

-31-

instances occurring after defendant was criminally charged, and Count Thirty-Three charges defendant with bank fraud, based on the aspects of the fraudulent scheme charged in Count One that were directed at a victim bank.  Because these counts charge defendant with fraud and have significant factual overlap with the other counts of the Indictment, they also are properly joined.  See United States v. Koen, 982 F.2d 1101, 1112 (7th Cir. 1992) (holding that evidentiary overlap justifies joinder of counts).  Finally, Counts Thirty-Four through Forty-Five charge defendant with money laundering, and, specifically, with transacting in the proceeds of wire fraud.  Proof of the money laundering counts requires proof of an underlying specified unlawful activity — here, the wire fraud charged in Counts One through Thirty-Two.  Therefore, Counts Thirty-Four through Forty-Five are properly joined as well.  See United States v. Tubol, 191 F.3d 88, 95 (2d Cir. 1999) ("Joinder is proper where the same evidence will support both of the joined counts.").

Defendant argues that even if the counts are properly joined, their joinder is prejudicial and severance should be granted pursuant to Rule 14, which gives the court discretion to order separate trials of otherwise properly-joined counts if the court concludes that joinder "appears to prejudice a defendant or the government."  The Supreme Court has indicated that because Rule 8 joinder

-32-

promotes judicial economy and efficiency and avoids the burden of multiple trials,

a defendant's request for relief under Rule 14 should be granted only if the court

determines that a "serious risk" of prejudice exists.  Zafiro v. United States, 506

U.S. 534, 539-40 (1993).  In that regard, "[m]ere allegations of prejudice are not

enough; and it is not sufficient simply to establish that severance would improve

the defendant's chances of acquittal.  Rather, he must demonstrate clear and

substantial prejudice resulting in a manifestly unfair trial." United States v.

Reicherter, 647 F.2d 397, 400 (3d Cir. 1981).

        Defendant raises the specter of "spillover," but such a claim, by itself,

is insufficient to show the kind of "clear and substantial prejudice" that is

necessary to support an order granting separate trials.  See United States v. Lore,

430 F.3d 190, 205 (3d Cir. 2005); United States v. Bieganowski, 313 F.3d 264,

287 (5th Cir. 2002); United States v. Shorter, 54 F.3d 1248, 1259 (7th Cir. 1995).

"Rather, some exacerbating circumstances, such as the jury's inability to

compartmentalize the evidence, are required." United States v. Urban, 404 F.3d

754, 776 (3d Cir. 2005) (citation and punctuation omitted).  Defendant does not

explain why the jury would have difficulty compartmentalizing the evidence in

this case.  In addition, the threat of "spillover" is non-existent where, as here,

defendant utterly fails to identify any evidence that would be admissible in one

-33-

trial but not in another.  See Reicherter, 647 F.2d at 400 (holding that Rule 14

motion was properly denied where evidence relating to drug manufacturing count

would have been admissible under Rule 404(b) at separate trial on drug

distribution count); United States v. Hart, 273 F.3d 363, 370 (3d Cir. 2001);

United States v. Eufrasio, 935 F.2d 553, 568-69 (3d Cir. 1991).  Defendant has not

carried his burden of establishing "clear and substantial prejudice," and his Rule

14 motion must be denied.

        Defendant's primary argument appears to be that even in the absence

of a showing of a "clear and substantial" risk of prejudice resulting from a joint

trial, considerations of judicial economy justify an order granting separate trials

under Rule 14.  This argument runs counter to the Rule itself, which provides for

severance only if joinder "appears to prejudice" a defendant or the government.

See Zafiro, 506 U.S. at 537 (stating that a court should grant severance pursuant to

Rule 14 "only" if there is a serious risk of prejudice).  Regardless, it is clear that

judicial economy militates in favor of a joint trial in this case.  Defendant's claim

that 45 individual trials on each count somehow would occupy less of the Court's

time than one trial on the entire Indictment is impossible to credit.  Defendant has

been charged with one conspiracy, one wire fraud scheme executed through

numerous individual wires, one bank fraud scheme, and several acts of money

-34-

laundering using the proceeds of the wire fraud.  Given the significant factual and evidentiary overlap among these allegations, a joint trial best promotes the interests of judicial economy in this case.

**VI.         Defendant Should Not Be Permitted to File Additional Pretrial Motions Without First Obtaining Leave of the Court**

Defendant moves for leave to file additional motions until the date of trial.  Because all discovery that the United States is obligated to provide the defendant has been supplied or made available to him, he is in possession of all of the information upon which he could base a motion.  Defendant has had sufficient time to review this discovery and prepare any motions he deems necessary, and therefore should not be permitted to file additional motions without first obtaining the permission of this Court.

**VII.**         **Defendant Is Obligated to Provide Reciprocal Discovery**

The United States previously has requested, and now seeks an order compelling, the production of reciprocal discovery by the defendant.  The right of the United States to reciprocal discovery from defendants is firmly established in Rule 16(b) of the Federal Rules of Criminal Procedure.  Under the clear language of this rule, courts uniformly have allowed reciprocal discovery.  See, e.g., United States v. Bump, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal disclosure over defendant's objection that it would violate his constitutional rights); United States v. Sherman, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).

To date, the United States has not received any reciprocal discovery from the defendant.  Because discovery has been made available to the defendant, the United States is entitled, pretrial, to reciprocal discovery under Rule 16(b) and the Court should direct disclosure of all discoverable information forthwith.  Specifically, pursuant to Rule 16(b)(1)(A), the government must be permitted to inspect and to copy photographs, books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if such items are within the defendant's possession, custody, or control and the defendant intends to use the items in defendant's case-in-chief at trial, and the government respectfully requests that the Court so order.

-37-

## <u>CONCLUSION</u>

The United States submits that each of defendant's pretrial motions must be denied; and that the Court should enter an order compelling defendant to immediately provide reciprocal discovery pursuant to Fed. R. Crim. P. 16(b).

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney


By:    /s/ Zach Intrater
       RACHAEL A. HONIG
       GURBIR S. GREWAL
       ZACH INTRATER
       Assistant U.S. Attorneys


DATED:    November 9, 2012
          Newark, New Jersey

-38-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of November, 2012, a true and correct copy of the foregoing Memorandum of the United States in Opposition to Defendant's Pretrial Motions was sent <u>electronically</u> to:

Henry E. Klingeman, Esq.
Anna G. Cominsky, Esq.
Krovatin Klingeman LLC
60 Park Place, Suite 1100
Newark, New Jersey 07102

David Schoen, Esq.
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106

/s/ Zach Intrater
ZACH INTRATER

Dated: November 9, 2012