

**U.S. DEPARTMENT OF JUSTICE**
*United States Attorney*
*District Of New Jersey*

*Gurbir S. Grewal*
*Assistant United States Attorney*
*Economic Crimes Unit*

*970 Broad Street, Suite 700*
*Newark, NJ 07102*

*office: 973-645-2874*
*fax: 973-297-2045*

November 21, 2013

**By ECF and Email**
The Honorable Joel A. Pisano
United States District Judge
Clarkson S. Fisher Federal Building
      & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

      Re:    United States v. Weinstein, Cr. No. 11-701 (JAP)

Dear Judge Pisano:

      Please accept this letter brief in lieu of a more formal submission in opposition to defendant ELIYAHU WEINSTEIN's recent motion to withdraw his guilty plea based on the government's alleged breach of its plea agreement with defendant WEINSTEIN (Dkt. No. 122).[1] For the reasons set forth in the government's opposition to defendant WEINSTEIN's motion for specific performance of the parties' plea agreement (Dkt. No. 109) and below, the Court should deny defendant WEINSTEIN's present motion because there has been no breach of the agreement.

## PRELIMINARY STATEMENT

      If one thing is clear by now, it is that defendant WEINSTEIN is a serial fraudster, who is willing to say and do whatever it takes to get what he wants. With his sentencing date looming, defendant WEINSTEIN now wishes to withdraw his guilty plea. To support his motion, he disregards the plain language of his plea agreement and any other inconvenient facts, offers a

---

[1] On November 13, 2013, defendant ELIYAHU WEINSTEIN submitted a "reply memorandum" (Dkt. No. 122) in support of his motion for specific performance of his plea agreement (Dkt. Nos. 98 and 99). At the November 15, 2013 scheduling conference, counsel for defendant WEINSTEIN indicated that the relief now being sought based on the government's alleged breach of the plea agreement was withdrawal of defendant WEINSTEIN's guilty plea, not specific performance of the agreement. The Court permitted the government an opportunity to respond.

tortured reading of the plea agreement, falsely claims that he has committed no new fraud since January 3, 2013 – the date of his guilty plea – and boldly accuses the government of having him arrested to make it difficult for him to prepare for his upcoming sentencing. Unfortunately for defendant WEINSTEIN, the language of his plea agreement is plain and unambiguous: it covers only conduct between June 2004 and the date of defendant WEINSTEIN's plea that was <u>known</u> to the government as of that date. And unfortunately for defendant WEINSTEIN (and for his growing list of victims), he has committed fraud at every single turn of this case, including well after his guilty plea. As a result, under any reading of the plea agreement – the plain one advanced by the government, or the tortured one posited by defendant WEINSTEIN, the government is not precluded from bringing the charges outlined in the <u>Weinstein II</u> complaint, and has not breached the plea agreement. The Court should deny defendant WEINSTEIN's motion, and this matter should proceed to sentencing.

## **RELEVANT BACKGROUND**

On January 3, 2013, pursuant to a written plea agreement with the government, defendant WEINSTEIN pleaded guilty in this case ("<u>Weinstein I</u>") to Count One of the Indictment (charging him with conspiracy to commit wire fraud) and Count Thirty-Six of the Indictment (charging him with transacting in criminal proceeds). The parties' plea agreement contained the following provision (hereinafter the "Non-Prosecution Clause"), among others:

> If Eliyahu Weinstein enters a guilty plea and is sentenced on these charges consistent with the stipulated range under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further criminal charges against Eliyahu Weinstein for his conduct, <u>now known to the Government</u>, from in or about June 2004 <u>through the date a plea</u> is entered in this matter.

(Dkt. No. 74 at 1 (emphases added).)

On or about March 17, 2013, the government first met and interviewed Victim G.C. and his son, Victim J.C.[2] During their interviews, they informed the government, in sum and substance, that they had been victimized

---

[2] An attorney representing Victims G.C. and J.C. had first reached out to the government on or about February 6, 2013 and informed the government that he represented individuals who had been victimized by defendant WEINSTEIN. At that time, the attorney did not disclose the victims' identities or the exact nature of their interactions with defendant WEINSTEIN because they were still in discussions with defendant WEINSTEIN and others throughout February 2013 and were hopeful they would be repaid.

2

by defendant WEINSTEIN and others, in connection with a series of transactions involving the Facebook IPO, a Florida real estate transaction, and investments in life insurance policies. Based on misrepresentations made by defendant WEINSTEIN and others, Victims G.C. and J.C. stated that over a period of several months between in or about February 2012 and in or about March 2012, they invested over $7 million with defendant WEINSTEIN and others, with much of their money going to an account at TD Bank in New Jersey ending in 5080 in the name of "148 Investments, LLC." According to the victims, their Facebook investments with WEINSTEIN were to be short-term investments; some were payable in 2012 and were past due, while others were due in February 2013 and were also past due. They also informed the government that they were in contact with defendant WEINSTEIN and his co-conspirators at the time, and were still hopeful that they would receive their principal and profits. They also informed the government that they delayed reporting the matter to the government because defendant WEINSTEIN had led them to believe that repayment of their principal and profits from their investments with him was imminent.

      The government's subsequent investigation, however, revealed that the representations that defendant WEINSTEIN and his co-conspirators made to Victims G.C. and J.C. were patently false, and not a single penny of their money was ever invested in any transaction related to Facebook. Rather, defendant WEINSTEIN converted their money to his own benefit, using it pay prior victims, make additional investments in the United States and overseas, and to pay his legal fees in <u>Weinstein I</u>. Among other things, defendant WEINSTEIN used the money to engage in a series of financial transactions with Rabbi C.B. in New York between in or about February 2012 and March 2013, using millions of dollars of Victims G.C. and J.C.'s funds.

      Given the continuing nature of defendant WEINSTEIN's criminal conduct, on or about May 13, 2013, Magistrate Judge Cox Arleo signed a criminal complaint against defendant WEINSTEIN ("<u>Weinstein II</u>") and issued a warrant for his arrest, having found that that there was probable cause to believe that he conspired to commit wire fraud and laundered money between February 2012 and May 2013, and that he committed five substantive counts of wire fraud at various times throughout 2012 while on release in this case. (<u>See</u> Mag. No. 13-8148, Dkt. Nos. 1 and 3.) On or about May 14, 2013, defendant WEINSTEIN was arrested on those charges, and has been in federal custody since that time.

The government's investigation has also revealed that defendant WEINSTEIN's fraud with Victims G.C. and J.C. was not an isolated event. Rather, while on pre-trial release in Weinstein I, defendant WEINSTEIN continued to defraud individuals. This criminal conduct continued well after the date of his plea agreement, and included the following schemes, among others:

- A scheme to defraud a group of Israeli investors of over $1 million in connection with non-existent Florida condominium transactions that spanned from in or about July 2012 through the date of his May 2013 arrest;

- A scheme to defraud a New Jersey investor out of shares or controlling interest in his company that spanned from in or about November 2012 through in or about February 2013, which included defendant WEINSTEIN causing a fraudulent check to be issued to the investor on or about January 31, 2013;

- A scheme to defraud a Florida investor out of shares or controlling interest in a Florida medical device company that spanned from in or about August 2012, and may still be ongoing;

- A scheme to defraud a Florida investor of approximately $65,000 in connection with a fictitious real estate investment in Little Egg Harbor, New Jersey that spanned from in or about early 2012 through the date of his May 2013 arrest, and included the following January 17, 2013 email perpetuating the fraud in which defendant WEINSTEIN falsely recounted to the investor, in substance and in part, that the investor had "invested approximately $65k alongside [another individual] to purchase a property in Little Egg Harbor... [but] [d]ue to Hurricane Sandy and the lenders['] reluctance to loan money in a devastated area (we only sustained minor damage) they were unable to close on the 17th. . . . I participated as your consultant and as you are well aware we have not discussed my compensation (as of yet)"; and

- A scheme to defraud an individual in New Jersey of over a million dollars by fraudulently obtaining checks from that individual that spanned from in or about June 2012 through the date of his May 2013 arrest.

None of the above schemes were known to the government at the time of defendant WEINSTEIN's guilty plea, and all of them continued past the date of defendant WEINSTEIN's plea on January 3, 2013.

On or about August 25, 2013, defendant WEINSTEIN filed a motion to compel specific performance of the plea agreement (Dkt. No. 99), seeking dismissal of the Weinstein II complaint as his remedy. In that motion, defendant WEINSTEIN argued that the government breached its plea agreement with him by arresting him on the charges in the Weinstein II complaint. WEINSTEIN claimed the criminal conduct outlined in the complaint was covered by his plea agreement because it was either encompassed by the conspiracy charged in Count One of the Indictment, or because he reasonably believed that it was included in the conduct from in or about June 2004 through January 3, 2013 for which the government agreed not to initiate further charges against him. In support of his argument, defendant WEINSTEIN argued that all of the criminal conduct alleged in the Weinstein II complaint occurred prior to the date of his plea. That argument, however, ignored the facts alleged in the Weinstein II complaint and Magistrate Judge Arleo's probable cause finding that the conspiracy charged in Count One of the Weinstein II complaint continued through May 2013.

On or about September 9, 2013, the government responded to defendant WEINSTEIN's specific performance motion, arguing that it was premature and without merit, since the conduct charged in the Weinstein II complaint was not covered by the plea agreement's Non-Prosecution Clause, because it was not known to the government at the time of the plea and because it continued past the date of the plea. (Dkt. No. 109.)

On or about November 13, 2013, defendant WEINSTEIN changed the relief he sought, and moved to withdraw his guilty plea based on the same alleged breach of the plea agreement discussed above. (See Dkt. No. 122.) Defendant WEINSTEIN now contends that the government's alleged breach of the plea agreement warrants withdrawal of his guilty plea as the remedy because the fact of the Weinstein II complaint has prevented him from adequately preparing for and presenting his case at sentencing. (Id. at 1, 2.)

Defendant WEINSTEIN's current motion and request for relief has no basis in reality. Rather than prepare for sentencing, defendant WEINSTEIN and his counsel have decided to spend their time since August on motions directed at issues wholly unrelated to sentencing (e.g., alleged breach of the plea agreement by the government (Dkt. Nos. 98, 99, 122), bail (Dkt. Nos. 100, 101, 114), and withdrawal of defendant WEINSTEIN's guilty plea (Dkt. Nos. 122-124)). Moreover, defendant WEINSTEIN's counsel has been unavailable for the last several months due to obligations in another case. (See Dkt. Nos. 105 and 120.) In any case, even if the government breached the plea agreement as defendant WEINSTEIN alleges (which it clearly did not), specific performance and dismissal of the Weinstein II complaint, not withdrawal of his guilty plea would be the appropriate remedy. See United States v. Pressley, 865 F. Supp. 2d 606, 615 (D.N.J. 2012) (Simandle, J.). ("In cases where the breach occurs because the Government has brought a subsequent indictment contrary to its

5

promises in a plea agreement, courts typically order 'specific performance' which amounts to dismissal of the subsequent indictment." (citation omitted)).

## ARGUMENT

Defendant WEINSTEIN's motion to withdraw his plea agreement based on the government's alleged breach of the agreement should be denied for three reasons. First, the plea agreement is a contract, and its Non-Prosecution Clause is clear and unambiguous. It prohibits the government from bringing criminal charges against defendant WEINSTEIN for criminal conduct that occurred between June 2004 and the date of defendant WEINSTEIN's plea – January 3, 2013 – that was known to the government at the time of the plea. Because the charges in the Weinstein II complaint were not known to the government at the time of the plea, they are not precluded by the Non-Prosecution Clause. Second, even if aspects of the Weinstein II conduct was known to the government or otherwise covered by the Non-Prosecution Clause, it continued past the date of the plea and is, therefore, not precluded by terms of the agreement. Third, even if there was a breach of the plea agreement, withdrawal of defendant WEINSTEIN's plea is not the appropriate remedy.

### I. The Plain and Unambiguous Language of the Plea Agreement Permits the Government to Pursue the Weinstein II Charges

Plea agreements are analyzed under contract law standards, United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998), and, therefore, this Court must "examine the plain meaning of the agreement itself and construe any ambiguities in the agreement against the government as drafter." United States v. Williams, 510 F.3d 416, 424-25 (3d Cir. 2007). "In determining whether the terms of a plea agreement have been violated, [the] court must determine whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." United States v. Badaracco, 954 F.2d 928, 939 (3d Cir. 1992) (quoting United States v. Nelson, 937 F.2d 1519, 1521-22 (11th Cir. 1988)).

Here, the Non-Prosecution Clause provides as follows:

> If Eliyahu Weinstein enters a guilty plea and is sentenced on these charges consistent with the stipulated range under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further criminal charges against Eliyahu Weinstein for his conduct, now

6

<blockquote>
<u>known to the Government</u>, from in or about June 2004 <u>through the date a plea</u> is entered in this matter.
</blockquote>

(Dkt. No. 74 at 1 (emphases added).) The plain and only meaning of this clause, which appears on the first page of the parties' plea agreement and was negotiated for by defendant WEINSTEIN, is that in exchange for his guilty plea, the government agreed to not initiate any further criminal charges against defendant WEINSTEIN for criminal conduct in which he engaged between June 2004 through January 3, 2013 that was known to the Government at the date of his plea. It simply cannot be read other way.

Defendant WEINSTEIN contends that "government advocates and exceedingly narrow interpretation" of the Non-Prosecution Clause," and that the clause should be construed against the government and should be given a broader interpretation. (Dkt. No. 122 at 3.) But there is simply no other plausible reading of the five words: "now known to the government." Where, as here, the language of a plea agreement is unambiguous "there is no reason to construe those portions against the government." <u>United States v. Williams</u>, 510 F.3d 416, 423 (3d Cir. 2007). Accordingly, the government is not advocating a particular "interpretation" of the Non-Prosecution Clause; it is simply refusing to ignore the words that appear on the page.

Nevertheless, based on his broader "interpretation" of the Non-Prosecution Clause, defendant WEINSTEIN maintains the he "reasonably and justifiably understood the plea agreement to prohibit further prosecutions for financial fraud similar, or related to the fraud scheme charged in the Indictment" from in or about June 2004 through the date of his plea – January 3, 2013 – regardless of whether or not those financial frauds were known to the government. (Dkt. No. 122 at 4.) Defendant WEINSTEIN's understanding of the Non-Prosecution Clause can hardly be considered reasonable for at least two reasons. First, it requires reading away the phrase "now known to the Government". Second, such a reading would be contrary to well-settled principles of contract law, which require the Court to "'interpret [a] contract in accordance with its plain, unambiguous meaning; giving effect to the clear language of the contract and refraining from torturing the language to create ambiguities.'" <u>United States v. Kenrick</u>, 2007 WL 4480187 (W.D. Pa. Dec. 14, 2007) (quoting <u>Linder & Associates, Inc. v. Aetna Cas. & Sur. Co.</u>, 166 F.3d 547, 550 (3d Cir. 1999)).

## II.     The <u>Weinstein II</u> Charges Post-Date Defendant WEINSTEIN's Plea Agreement

Defendant WEINSTEIN concedes (as he must) that if the conspiracy alleged in the <u>Weinstein II</u> complaint extended past the date of his plea agreement, the plea agreement does not prevent the government from

7

initiating new criminal charges against him.  Indeed, defendant WEINSTEIN admits that he defrauded Victims G.C. and J.C. in 2012, but maintains that the fraud was completed before the date of his plea agreement and "no <u>criminal</u> conduct post-dated the plea agreement in this case."  (Dkt. No. 122 (emphasis in original).)  According to defendant WEINSTEIN, his lies to Victim G.C. and J.C. in February 2013 do not amount to "<u>criminal</u> conduct" because the fraud was "completed" a year earlier and the February 18, 2013 meeting did not "further the alleged conspiracy."  (Dkt. No. 99 at 12.)  Defendant WEINSTEIN's self-serving characterization of the charged conspiracy ignores a number of inconvenient facts.

<u>First</u>, Magistrate Judge Arleo found probable cause to believe that defendant WEINSTEIN engaged in wire fraud conspiracy that extended from in or about February 2012 through in or about May 2013 – approximately four months after defendant WEINSTEIN pled guilty.  (<u>See</u> Mag. No. 13-8148, Dkt. No. 1.)

<u>Second</u>, the <u>Weinstein II</u> complaint alleges specific <u>criminal</u> acts that occurred after the date of defendant WEINSTEIN's plea.  To begin with, as alleged in the complaint, Victim G.C.'s $1.2 million investment in purported Facebook Transaction #1 was returnable by <u>February 7, 2013</u> – a month after defendant WEINSTEIN's guilty plea.  (<u>Id</u>. at ¶ 8.)  When Victim G.C. sought repayment of monies owed to him in February 2013, defendant WEINSTEIN met with Victim G.C. and his son, Victim J.C.  During a meeting on or about February 18, 2013 – well over a month after he pled guilty – defendant WEINSTEIN lied to his victims.  (<u>Id</u>. at ¶¶ 49-56.)  Unbeknownst to defendant WEINSTEIN, the victims recorded this meeting, during which defendant WEINSTEIN told them that there had been three Facebook transactions and "[e]verybody made their money."  (<u>Id</u>. at ¶50.)  That was a lie.  The victims asked about $2.83 million that believed had been invested in a real estate transaction.  Defendant WEINSTEIN told them that it was moved to a Facebook transaction: "It's been in Facebook.  Facebook traded and made money, and it's available now."  (<u>Id</u>. at ¶52.)   That too was a lie.  When the victims inquired about Facebook Transaction #1 which was payable as of February 7, 2013, the following exchange took place:

**Victim G.C.**:   The $1.2 million was due and payable.

**Defendant WEINSTEIN**:   Yeah!  148's transaction was 1.2.  We finished that transaction.  We sold the Facebook…[inaudible]… your profit of 167 plus 1.2.  That money went for a fourth transaction in Facebook.  The last transaction.

(Id. at 18 (¶55).)  That, of course, was another lie.  There were no Facebook transactions; defendant WEINSTEIN and his co-conspirators were using Victim G.C.'s money for their own benefit and, among other things, had used it to further other business arrangements that they never disclosed to Victim G.C. or Victim J.C.

Defendant WEINSTEIN, however, claims that the February 18, 2013 meeting could not have furthered the alleged conspiracy because the fraud had already been completed.  (See Dkt. No. 99 at 12; Dkt. No. 122 at 3.)  Defendant WEINSTEIN further claims that his argument is "irrefutable."  (Dkt. No. 122 at 3.)  But it is not only a matter of common sense, it is also well-settled that "lulling communications" between a fraudster, such as defendant WEINSTEIN, and victim investors that are designed to lull them into a false sense of security or postpone their ultimate complaint to the authorities are acts in furtherance of a conspiracy.  See, e.g., United States v. Hoffecker, 530 F.3d 137, 166-67 (3d. Cir. 2008); United States v. Fishman, 645 F.3d 1175, 1192-93 (10th Cir. 2011).

Following the February 18, 2013 meeting, defendant WEINSTEIN caused a bad check to be delivered to an attorney representing Victim G.C.  As alleged in the Weinstein II complaint:

> [O]n or about February 26, 2013, defendant WEINSTEIN and his co-conspirators caused a check to be issued to Attorney A's trust account in the amount of $188,000 as partial repayment of monies owed to Victim G.C.  The check was provided by "Rabbi P," who interceded on defendant WEINSTEIN's behalf to broker a settlement with Victim G.C.  That check also bounced.

(Id. at ¶37.)  Tellingly, defendant WEINSTEIN does not address this unfunded check – which he caused to be passed over a month and a half after his guilty plea – in any of his moving papers.

Finally, defendant WEINSTEIN is charged by complaint in Weinstein II.  As discussed above, the investigation has revealed a number of additional fraudulent schemes in which defendant WEINSTEIN was involved, which were not known to the government at the time of defendant WEINSTEIN's plea, and which continued well past the date of his guilty plea.  Moreover, there are additional acts related to the scheme outlined in the Weinstein II complaint that occurred between the date of defendant WEINSTEIN's guilty plea and his May 2013 arrest.  All of these facts and charges will be included in a formal indictment if that is how the Weinstein II matter proceeds.

### III. Even if Defendant WEINSTEIN Prevails On His Motion, Withdrawal Of His Guilty Plea Is Not the Appropriate Remedy

"In cases where the breach occurs because the Government has brought a subsequent indictment contrary to its promises in a plea agreement, courts typically order 'specific performance' which amounts to dismissal of the subsequent indictment." United States v. Pressley, 865 F. Supp. 2d 606, 615 (D.N.J. 2012) (Simandle, J.) (citation omitted). Therefore, in the event the Court finds the government breached the plea agreement by bringing the charges in Weinstein II, then the appropriate remedy would be specific performance of the plea agreement and dismissal of the Weinstein II complaint, not withdrawal of defendant's guilty plea.

### CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny defendant ELIYAHU WEINSTEIN's motion to withdraw his guilty plea on the ground that the government allegedly breached its plea agreement with defendant WEINSTEIN.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By: GURBIR S. GREWAL
RACHAEL A. HONIG
ZACH INTRATER
Assistant U.S. Attorneys

cc: Eric M. Creizman, Esq. (by ECF and email)
Caroline J. Polisi, Esq. (by ECF and email)