

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

_____

*970 Broad Street, 7th floor*              973-645-2700
*Newark, New Jersey 07102*

December 27, 2013

**By ECF and E-Mail**
Hon. Joel A. Pisano
United States District Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

    Re:   <u>United States v. Eliyahu Weinstein</u>, Crim. No. 11-701 (JAP)

Dear Judge Pisano:

    Please accept this letter brief in lieu of a more formal submission as the Government's opposition to defendant Eliyahu Weinstein's most recent motion to withdraw his guilty plea (Dkt. No. 137).

## PRELIMINARY STATEMENT

    Weinstein seeks yet again to withdraw his guilty plea. First it was the Government's fault: it supposedly violated the plea agreement by daring to bring new charges against Weinstein for committing new fraud after he pleaded guilty. Next it was this Court's fault for supposedly violating Rule 11 by involving itself in plea negotiations. Now Weinstein chastises not only the Government, but also his attorneys at Proskauer, who Weinstein alleges labored under actual or potential conflicts of interests because two Proskauer attorneys were present for a meeting with Morris Rotenstein in or around February 2011 concerning a purported insurance transaction (the "February 2011 Meeting"), and then advised Weinstein to plead guilty nearly two years later in January 2013 in the face of overwhelming evidence.

    Weinstein's latest salvo fails for at least five reasons. First, he ignores the controlling legal standard. Because the issue was not raised before Weinstein pled guilty, no prejudice can be presumed. <u>See</u> <u>Mickens v. Taylor</u>, 535 U.S. 162, 166 (2001). Instead, Weinstein has the burden of showing that

the conflict in question significantly affected his counsel's performance. Only then will prejudice be presumed (here, pleading guilty where Weinstein would have gone to trial had he been represented by conflict-free counsel). Since Weinstein cannot show – indeed, has not even alleged – an adverse impact on his decision to plead guilty, his motion should fail. In fact, Weinstein has not even shown an actual conflict of interest to begin with.

     Second, Weinstein was represented by incontestably conflict-free counsel throughout the relevant time period: Henry E. Klingeman. Mr. Klingeman became Weinstein's lead counsel on July 22, 2011. David I. Schoen, an experienced litigator from Alabama, entered on September 23, 2011. Mr. Klingeman and Mr. Schoen were therefore Weinstein's counsel when the Indictment was issued in October 2011, and so had more than a year to investigate the circumstances of the February 2011 Meeting and the purported insurance transaction that supposedly resulted in Proskauer's conflict. Moreover, Mr. Klingeman was still Weinstein's counsel of record at the plea hearing; and he received the Jencks material at the same time that the Proskauer attorneys did. Yet at no time did Mr. Klingeman suggest to this Court (or the Government) that Proskauer might be laboring under a potentially disqualifying conflict of interest.

     Third, Weinstein's analysis attempts to squeeze a square peg into a round hole. This case is different – profoundly different – from the ones cited in Weinstein's motion. So far as the Government can tell, Proskauer's attorneys did nothing to intentionally further Weinstein's fraud, nor witnessed any events that would have required their testimony at any trial.[1] The

---

[1] Mr. Harris is the target of particularly savage attacks by Weinstein, in a style that is now sadly familiar to this Court. This is unfortunate. Mr. Harris is a partner at a major law firm. He is a former Assistant United States Attorney. He clerked for two different Justices of the United States Supreme Court. For Weinstein to publicly file statements like "Harris could be viewed as a co-conspirator and accomplice of Weinstein since Harris aided and abetted the charged insurance transaction scheme"; "Harris can be easily viewed as having facilitated Weinstein's charged fraud by encouraging an alleged 'victim' to invest in the scheme"; "Harris (and possibly other Proskauer lawyers) could have been (and still can be) charged with or professionally disciplined for the subject insurance transaction"; "Harris appeared equally oblivious to his ethical obligations"; and "Harris showed questionable judgment, as well as ethical myopia" – certainly does call into question the judgment and the ethics of someone involved in this case, but it is not Mr. Harris. The Court has been forced to deal with this type of conduct before. At a recent hearing, the Court stated, "Mr. Creizman, I don't know what the standards of practice are that you abide by, but one thing we expect in this court is common courtesy among adversaries and refraining from vituperative, sarcastic language. . . . It is insulting, Mr. Creizman." (Nov. 25, 2013 Tr. at 25.) Unfortunately, the Court's message appears to have been ignored by Mr. Creizman.

     The standards of practice are simple, clear and should be intuitive. "The Guidelines For Litigation Conduct" adopted by the American Bar Association's Section of Litigation in August 1998 have been incorporated into this Court's Local Rules, and apply in both civil and criminal

Government has never alleged that the purported insurance transaction underlying the February 2011 Meeting was itself illegal – or, indeed, that anything at all untoward happened at the meeting Mr. Harris attended. Instead, the problem with what Weinstein did to Mr. Rotenstein – the reason that he defrauded Mr. Rotenstein – is the same reason that undergirds all of the other counts in the Indictment:  Weinstein said one thing to his victim, and did another thing with the money.  Weinstein proposed a legitimate insurance transaction to Mr. Rotenstein.  On February 16, 2011, Mr. Rotenstein then provided approximately $101,700 to the account specified by Weinstein.  By the end of the day on February 17, 2011, all of that money was gone, to approximately eleven different recipients, as well as $9,000 in cash withdrawals.  In less than 48 hours, Weinstein spent all of Mr. Rotenstein's money:  on private school tuition for his children; on payments to prior victims, and on $2,000 in groceries from a kosher supermarket in Lakewood, Weinstein's home town, among other things.  The issue is therefore not what, if anything, Mr. Harris said to Mr. Rotenstein about the validity of the purported insurance transaction.  The issue is rather what Weinstein said, on the one hand – which the Government would have elicited from Mr. Rotenstein, not from Mr. Harris – and what Weinstein did with Mr. Rotenstein's money, on the other hand.  The only necessary witness to this transaction, besides Mr. Rotenstein, would have been an FBI summary agent, to explain the attached flowchart.   (GX 1523, attached hereto as Exhibit A).

Fourth, Weinstein's own motion is internally inconsistent.  In typically strong language, Weinstein initially alleges that the Government and Proskauer somehow hid the ball regarding Mr. Harris's attendance at the February 2011 Meeting. (Dkt. No. 137 at 1-4.)  But then, later in his motion, Weinstein lists three different instances in which the defense made this Court aware of Harris's presence at the February 2011 Meeting:  in Weinstein's pretrial motion papers, and twice on the record at pretrial hearings.  (Id. at 9.)  How could this Court be unaware of something that Weinstein's attorneys – Weinstein's unquestionably unconflicted attorneys, Mr. Klingeman and Mr. Schoen – put in their motion papers and repeatedly put on the record?  Mr. Harris's attendance at the February 2011 Meeting was known all along to the Court, to defense counsel about whom there is no claim of conflict, and of course to Weinstein himself.

---

cases.  See L. Cr. R. 1.1, L. Civ. R.103.1 and Appendix R.  They provide in pertinent part that a lawyer owes a basic duty "[to] treat all other counsel, parties, and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications."  Local Rules App'x R at R2.  The Guidelines further provide in pertinent part that a lawyer practicing in this District owes the following duty to the Court:  "[To] speak and write civilly and respectfully in all communications with the court."  Id. at R5.

Fifth, the logic of Weinstein's latest motion is preposterous. To succeed it would require this Court to accept all of the following:

a. that Proskauer entered the case in December 2012 hell-bent on taking the case to trial (despite the documented fact that the parties had been discussing various plea possibilities for months, and despite the fact that Weinstein had belatedly signed a counteroffer to an earlier plea agreement just before Proskauer's entry into the case);

b. that although Proskauer entered the case raring to go to trial, it encountered the Jencks material regarding the February 2011 Meeting, immediately made a 180 degree turn to save their own professional skins (and even stay out of jail), and forced Weinstein to take a plea that he otherwise would not have accepted (despite the fact that Proskauer managed to negotiate, for a defendant who stole more than $200 million, a plea with a possibility of probation);

c. that Proskauer counseled Weinstein to take a plea after reading the Jencks not because the Jencks consisted of dozens of absolutely devastating memoranda detailing the overwhelming evidence of Weinstein's vast, sophisticated, and brazen fraud, and the statements of the witnesses who would take the stand and destroy any possible defenses, but rather because two pieces of Jencks mentioned a meeting regarding an insurance transaction that could well have been legitimate if carried out as described;

d. that Mr. Harris had somehow either forgotten his attendance at the February 2011 meeting, or, more nefariously, knew all along that he was the next target of the Government's investigation, and so deliberately entered into a case in which he had a "blatant, "obvious," and "serious" conflict of interest in a plot to force Weinstein into a guilty plea for the sole purpose of burying Mr. Harris's own misdeeds in the graveyard of foregone trials;

e. that Weinstein's unquestionably conflict-free attorney, Mr. Klingeman (who wrote the pretrial motions describing the February 2011 meeting and Proskauer's role in it, and who was present at both of the oral arguments which raised the February 2011 meeting, and Proskauer's role in it) also advised pleading guilty because he was either complicit in Proskauer's scheme to force Weinstein to plead guilty or completely incompetent;

f. that after Weinstein's current counsel entered this case on August 14, 2013, neither he nor anyone at his firm read any of the Jencks for over

    four months, and only recently discovered the February 2011 Meeting; and

  g. that the real reason Weinstein first advanced this issue on December 23, 2013 – three hundred and fifty four days after he pled guilty – is not because Weinstein is desperately trying to delay sentencing or escape his guilty plea so that he can, in the words of one of his new "of counsel" "reach a global settlement [of Weinstein I and II] through negotiation and consent" (and on better terms to Weinstein), but rather because he never would have pled guilty absent Proskauer's irredeemable conflict.

If the Court does not buy every single one of those preposterous propositions, then Weinstein's current motion, like his previous attempts to withdraw his guilty plea, must fail.

## ARGUMENT

  A. Legal Standards For Motion to Withdraw A Guilty Plea

    The legal standards remain what they were a month ago, when the Government last had to respond to a Weinstein motion to withdraw his guilty plea, and the Government respectfully invites the Court's attention to the Government's most recent opposition papers for a full exposition of the legal standards.  (See Dkt. No. 127 at 8-9).  Briefly:  A plea of guilty is "a grave and solemn act, which is accepted only with care and discernment." United States v. Hyde, 520 U.S. 670, 677 (1997) (quotation marks omitted).  Consequently, "[o]nce a court accepts a defendant's guilty plea, the defendant is not entitled to withdraw that plea simply at his whim." United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003).  Rather, the defendant must show a "'fair and just reason' for the withdrawal of his plea." United States v. King, 604 F.3d 125, 139 (3d Cir. 2010) (quoting Fed. R. Crim. P. 11(d)(2)(B)).

    "The burden of demonstrating a 'fair and just' reason falls on the defendant, and that burden is substantial." Jones, 336 F.3d at 252; see also United States v. Isaac, 141 F.3d 477, 485 (3d Cir. 1998).  There is a three-part test to determine if a defendant has carried his "substantial" burden: "(1) the defendant asserts his innocence; (2) the defendant proffered strong reasons justifying the withdrawal; and (3) the government would be prejudiced by the withdrawal." King, 604 F.3d at 139 (quotation marks omitted); see also United States v. Huff, 873 F.2d 709, 711 (3d Cir. 1989).  The Court of Appeals will not disturb the District Court's decision on whether to permit a defendant to withdraw his guilty plea absent an abuse of discretion.  See United States v. Brown, 250 F.3d 811, 815 (3d Cir. 2001).

B. <u>There is No Claim of Innocence, and the Government Would be Prejudiced</u>

Weinstein has never claimed, in any of his motions to withdraw his guilty plea, that he is actually innocent. He knows, the Government knows, and his victims certainly know, that he stole more than $200 million.

Second, the Government would be prejudiced if Weinstein were allowed to escape his guilty plea, for the same reasons as set forth in the Government's most recent opposition. (See Dkt. No. 127 at 10-11.) Just one reason merits reiterating, which is that if Weinstein's plea is withdrawn, justice would again be delayed for the victims of Weinstein's crimes – crimes that, again, even he does not deny he committed. What of these victims? They are dozens of real people who have done nothing wrong and who have a "right to proceedings free from unreasonable delay." 18 U.S.C. § 3771(a)(7). They have been waiting for years for a measure of closure, and perhaps for pennies on the dollar in restitution. Several of these victims are now scheduled to testify at Weinstein's upcoming sentencing. Will the Government be forced to tell these victims, once again, to hold on for who knows how much longer?

C. <u>Weinstein Cannot Escape His Guilty Plea Unless He Shows That Proskauer Suffered from a Conflict of Interest That Actually Prejudiced Him</u>

This motion, like those before it, comes down to just one issue – has Weinstein "proffered strong reasons justifying the withdrawal?" He has not. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." That right is "fundamental to our system of justice." <u>United States v. Morrison</u>, 449 U.S. 361, 364 (1981); see <u>Strickland v. Washington</u>, 466 U.S. 668, 685 (1984); <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344 (1963). The right to effective assistance of counsel encompasses the right to counsel whose advocacy is not affected by an actual conflict of interest. <u>Strickland</u>, 466 U.S. at 692.

"[T]he right to the effective assistance of counsel is recognized not for its own sake," however, "but because of the effect it has on the ability of the accused to receive a fair trial." <u>Mickens</u>, 535 U.S. at 166 (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)). Thus, in general, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." <u>Strickland</u>, 466 U.S. at 692. In three specific contexts, however, prejudice may be presumed. The first two contexts involve cases in which a defendant is actually or constructively denied counsel, which is not the case here. <u>Smith v. Robbins</u>, 528 U.S. 259, 287 (2000); see <u>Cronic</u>, 466 U.S. at 659 n.25.

The third context in which prejudice may be presumed involves cases in which "counsel is burdened by an actual conflict of interest." Robbins, 528 U.S. at 287; see Mickens, 535 U.S. at 166. As the Court explained in Strickland, however, the presumption of prejudice in that context is "more limited" than in the context of the actual or constructive denial of counsel. Strickland, 466 U.S. at 692 ("[T]he rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above."). "Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" Id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)); see Mickens, 535 U.S. at 171, 172 n.5.

This is true even where the trial court was aware of a potential conflict, if neither the defendant nor his counsel alerted the district court that the conflict might warrant disqualification. Mickens, 535 U.S. at 171-74. In that regard, "[t]he trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable." Id. at 172-73 (citations omitted); see Sullivan, 446 U.S. at 347 (explaining that, in the absence of a timely objection, a court could reasonably "assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist"). This is because counsel "is in the best position professionally and ethically to determine when a conflict of interest exists"; and has an "obligation . . . to advise the court at once of the problem." Holloway v. Arkansas, 435 U.S. 475, 485 (1978) (internal quotations and citations omitted). Thus, absent timely objection, to obtain relief on the basis of a supposedly disqualifying conflict of interest, the defendant must show an actual conflict that adversely affected counsel's performance. Mickens, 535 U.S at 171-74; Sullivan, 446 U.S. at 347.

An actual conflict of interest arises if, during the course of the representation, the attorney's and the defendant's "interests diverge with respect to a material factual or legal issue or to a course of action." Sullivan v. Cuyler, 723 F.2d 1077, 1086 (3d Cir. 1983). Not every divergence in interest amounts to an actionable conflict. While "[m]any courts have found an actual conflict of interest when a defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant," United States v. Levy, 25 F.3d 146, 156 (2d Cir. 1994); Zepp, 748 F.2d at 136, a conflict does not arise where an attorney "fear[s] . . . rebuke from the court," United States v. Shark, 51 F.3d 1072, 1076 (D.C. Cir. 1995) (per curiam), or even where he is subject to citation for his conduct defending a client, for instance in contempt proceedings, United States v. Taylor, 139 F.3d 924, 932 (D.C. Cir. 1998)

("Because all attorneys potentially face contempt citations, no particular attorney can be considered ineffective due to a concern that he or she might be so cited.").

It is worth noting that Weinstein's motion does not even mention Mickens, the controlling Supreme Court precedent. That is because Weinstein does not, and cannot, show that his attorneys' performance was adversely affected. See Mickens, 535 U.S. at 171, 172 n.5. It is undisputed that Proskauer, Mr. Klingeman, and Mr. Schoen were all aware of the February 2011 meeting: Proskauer because they engaged in the meeting, Mr. Klingeman and Mr. Schoen because they mentioned the meeting in their motion papers and raised it repeatedly on the record. Yet neither Proskauer nor Mr. Klingeman ever made any objection at any point that would have put the District Court on notice that Proskauer could have been jeopardizing its role as defense counsel. Government of Virgin Islands v. Zepp, 748 F.2d 125, 134 (3d Cir. 1984). And even now, Weinstein fails to show that Proskauer experienced an actual conflict based upon Mr. Harris's participation in the February 2011 meeting. Mr. Harris has not been subject to criminal prosecution or even disciplinary consequences as a result of any conduct.

This is true for a very simple reason: it is undisputed that the purported insurance transaction presented at the February 2011 meeting was, as presented, legitimate. The Government never argued, and would never argue, to the contrary. Instead, the grand jury indicted Weinstein for his actions with respect to Mr. Rotenstein's money in February 2011 because he stole all the money within 48 hours and used it for his own benefit, not for any insurance transaction. That is the fraud. If the issue came up at trial, the Government would have stipulated that the purported insurance transaction was wholly legitimate, because its legitimacy was completely unrelated to Weinstein's theft of Mr. Rotenstein's funds.

Therefore, Mr. Harris would not have been a "necessary witness" in Weinstein's trial. All of the information necessary to convict Weinstein for this aspect of Count One, and for Counts Thirty-One and Thirty-Two, would come from two places only: Mr. Rotenstein, who would describe where Weinstein told him his money would be going; and an FBI summary agent, who would explain where Mr. Rotenstein's money actually went.

Even if Mr. Harris had a conflict (which he did not), Weinstein cannot satisfy the second requirement, that any conflict affected Proskauer's defense of Weinstein. An adverse effect is established if "some plausible alternative defense strategy or tactic might have been pursued," even if the defense would not "necessarily have been successful," so long as it "possessed sufficient substance to be a viable alternative." United States v. Morelli, 169 F.3d 798,

- 8 -

810 (3d Cir. 1999) (quoting United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988)) (further quotation omitted).  Examples of adverse effects on a counsel's performance include significant omissions in a client's defense, such as failing to cross-examine a critical defense witness or to object to inadmissible evidence, Glasser v. United States, 315 U.S. 60, 72-75 (1942), or failing to make any significant effort to negotiate a plea or cooperation agreement on a client's behalf, United States v. Williams, 372 F.3d 96, 107 (2d Cir. 2004).

     Here, Weinstein would have to show that he would not have pled guilty but for the conflict.  Cf. Padilla v. Kentucky, 559 U.S. 356 (2010); Hill v. Lockhart, 474 U.S. 52 (1985).  That is, Weinstein "must show that counsel's alleged conflict of interest rendered his guilty plea involuntary." United States v. Scruggs, 691 F.3d 660, 670 (5th Cir. 2012).  Thus, if Weinstein could prove that, because of the supposed conflict, Proskauer effectively abandoned its preparation for trial and instead coerced Weinstein to plead guilty, Weinstein might have a valid claim.  But Weinstein cannot make that showing here, because he was also represented at the guilty plea hearing by an attorney to whom Harris's supposed conflict cannot be imputed: Mr. Klingeman.  And Mr. Klingeman advised Weinstein to plead guilty on the terms that Proskauer had secured.

     In addition, Weinstein cannot simply rely on sheer speculation as the only support for his motion.  United States v. Burgos-Chaparro, 309 F.3d 50, 52-53 (1st Cir. 2002) is instructive.  There, Burgos claimed that his attorney had simultaneously represented a co-defendant, Feliciano, in a related case when Burgos pled guilty to drug charges.  The First Circuit rejected Burgos's claims pursuant to Mickens and related case law.  The Court held that, to be entitled to relief, "Burgos would have to identify some way in which his representation by [the lawyer] was compromised by the [lawyer's] representation of Feliciano.  This could be because of some action taken by [the lawyer] or by some opportunity foregone; but some adverse action or inaction is required that can be traced to the conflict in loyalty.  Merely to speculate that the divided loyalty could have caused such a step is not enough."  Id. at 53 (citations omitted).  The Court continued, in language particularly applicable to Weinstein's instant motion, "[a]ll Burgos offers is speculation. . . . [The case law] requires a showing that [an alternative] course would have been undertaken but for counsel's dual loyalty; and Burgos makes no showing on this point.  Nor, given the evidence against Burgos, is there any reason to think that this course held out any promise."  Id.

     Similarly, here the record reflects that a guilty plea was the best – indeed, perhaps the only – course for Weinstein.  The far more logical inference is that once Proskauer received the Jencks material, they realized that it

contained a mountain of devastating evidence against their client, and that the case really was not triable.  This, of course, is the same conclusion to which Weinstein's incontestably conflict-free counsel, Mr. Klingeman, had come, as Mr. Klingeman both advised Weinstein to plead guilty on the terms that Proskauer had secured, and also, in early December 2012, had Weinstein sign a counteroffer to an expired plea agreement which would have prescribed a sentence of 60-120 months.  (See Dkt. No. 127 at 3-4.)  Pleading guilty was therefore in Weinstein's interest rather than in conflict with it.  See Gambino, 864 F.2d at 1072 (rejecting claim of actual conflict when defense counsel did not pursue a claim "because he concluded that it was specious and could have imperiled the credibility of appellant's entire defense"); United States v. Mays, 77 F.3d 906, 908 (6th Cir. 1996) (holding that a defendant must show that the conflict caused the attorney to make bad choices for defendant; the incidents defendant raised appeared to have been part of a losing strategy).  Therefore, because the defense strategy purportedly precluded by counsel's conflict did not "possess[] sufficient substance to be a viable alternative," Morelli, 169 F.3d at 810, Weinstein cannot show that the supposed conflict adversely affected his counsel performance.  Therefore, Weinstein's claim of actual conflict fails.

Weinstein cannot circumvent Mickens by arguing that Proskauer engaged in purported ethical breaches.  According to Mickens, "[t]he purpose of our Holloway and Sullivan exceptions from the ordinary requirements of Strickland . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel."  Id.  That is because "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." Nix v. Whiteside, 475 U.S. 157, 165 (1986).  Thus, whether Mr. Harris or Proskauer in fact violated any ethical canons is beside the point.  Instead, "[s]ince this was not a case in which . . . counsel protested his inability simultaneously to represent multiple defendants; and since the trial court's failure to make the Sullivan-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance." Mickens, 535 U.S. at 173-74.

Indeed, it would have been structural error to disqualify Weinstein's retained counsel of choice absent sufficient reason.  See United States v. Gonzalez-Lopez, 548 U.S. 140, 146-52 (2006).  And it is by no means clear that Mr. Harris committed any ethical lapses.  He was not testifying as a witness, but participated in a meeting concerning a transaction that the Government concedes was, as described, completely legitimate.  Beyond that, when the meeting occurred, Weinstein was under no restrictions that would have precluded him from engaging in such a transaction.

- 10 -

Moreover, even if Mr. Harris was a "necessary witness," his actions – far from giving rise to potential criminal action – did not even violate any ethical rules, because any testimony he might have provided would have fallen squarely into an exception in the rules of professional conduct.  Rule 3.7 of the New Jersey Rules of Professional Conduct ("N.J. R.P.C.") provides, in pertinent part, that:  "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue . . . ."  (N.J. R.P.C. 3.7(a).)  Because the absolute most Mr. Harris could have testified to would be on an "uncontested issue," i.e., that the insurance transaction, as proposed, was legitimate, he could have been called at trial and not labored under an actual conflict of interest.  Certainly, Mr. Harris's exposure (if any) was not in the same galaxy as defense counsel's in Zepp, who faced criminal charges on the same conduct for which defendant was tried, as well as serious disciplinary consequences for his potential involvement in destruction of evidence.  Zepp, 748 F.2d at 136.  Nor is it akin to counsel's exposure in Levy, where counsel faced criminal charges for assisting a defendant to flee criminal prosecution.  Levy, 25 F.3d at 156.

And even if the District Court would have had a sufficient reason to disqualify Proskauer, that does not mean that the Court was required to do so.  To the contrary, the Court would have had broad latitude in this area, Wheat v. United States, 486 U.S. 153, 162-63 (1988), and could "avoid all possibility of reversal by . . . seeking a waiver[,]" Mickens, 535 U.S. at 173.  Here, given that Weinstein had been meeting with Proskauer for more than a year, and specifically brought Proskauer into the case in December 2012, it is extremely unlikely that Weinstein, if asked at his guilty plea hearing, would have declined to waive any potential conflict.  And if Weinstein did decline to waive the conflict, this Court would have had discretion to compel Weinstein either to proceed with Mr. Klingeman alone or no counsel at all.  Cf., e.g., United States v. Mitchell, 777 F.2d 248 (5th Cir. 1985) (defendant waived his right to counsel when, in bad faith and for purpose of delay, defendant retained counsel known to have a conflict of interest and failed to retain other counsel).

## CONCLUSION

In sum, Weinstein's most recent motion should be viewed in the context of this case as a whole: it is part and parcel with Weinstein's desperate strategy to escape the consequences of a guilty plea that he entered into freely and voluntarily, represented by conflict-free counsel, nearly a year ago, because he now been caught committing yet more fraud, because he has provided not a dime of restitution to his victims, and because he rightly fears a lengthy prison term for his enormous, long-running fraud scheme. This latest motion is more of the same, and the Court should treat it as such. For all these reasons, Weinstein's most recent allegations, nearly a year after his plea, and just days before his sentencing, of nefarious schemes by his own attorneys cannot be trusted. His motion should be denied.

                                Respectfully submitted,

                                PAUL J. FISHMAN
                                United States Attorney

                                s/Zach Intrater

BY:   RACHAEL A. HONIG
        GURBIR S. GREWAL
        ZACH INTRATER
        Assistant United States Attorneys

Cc:   Eric Creizman, Esq. (by E-Mail and ECF)
       Caroline Polisi, Esq. (by E-Mail and ECF)