UNITED STATES DISTRICT COURT
DISTRICT COURT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Docket No. 11-CR-701 (JAP) |
| -v- : | |
| ELIYAHU WEINSTEIN, and : | |
| VLADAMIR SIFOROV, : | |
| Defendants. : | |

# REPLY MEMORANDUM OF LAW IN SUPPORT
# OF ELIYAHU WEINSTEIN'S MOTION
# TO WITHDRAW HIS GUILTY PLEA

ERIC M. CREIZMAN
CREIZMAN PLLC

565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5011
Email: ecreiz@creizmanllc.com

*Attorneys for Eliyahu Weinstein*

RICHARD A. GREENBERG
STEVEN Y. YUROWITZ
NEWMAN & GREENBERG

950 Third Avenue
New York, New York 10022
Tel.: (212) 308-7900
Fax: (212) 826-3273

*Of Counsel*

## PRELIMINARY STATEMENT

This memorandum of law is submitted in reply to the government's letter-memorandum, dated December 27, 2013 ("GL"), in opposition to defendant Eliyahu Weinstein's motion to withdraw his guilty plea on grounds of conflict, and in further support of the arguments set forth in Weinstein's memorandum of law, dated December 26, 2013 ("DM"), in support of the motion.

### A. Introduction

Stripped of its fulminations designed to shift blame to Weinstein and others, e.g., GM 2 n.1 ("Mr. Harris is the target of particularly savage attacks attacks by Weinstein"), the government's opposition fails for two fundamental reasons: 1) it is wrong on the facts, and 2) it is wrong on the law. Before demonstrating how and why the government has got it so wrong, however, it is worth noting the significant factual and legal propositions advanced by Weinstein which the government simply ignores or does not dispute:

- The government does not dispute Weinstein's contention that it had a duty to apprise the Court of Harris's and Proskauer's conflicts—a duty it undeniably failed to perform. Instead, the government attempts to shift the blame to everyone else including the defendant (GL11), Klingeman (GL2), Proskauer (GL4) and ultimately even the Court by asserting that the Court was aware of the facts. GL 3 ("How could this Court be unaware of something that Weinstein's attorneys . . . put in their motion papers and repeatedly put on the record?") As demonstrated below, if the government were correct that the Court was aware – and we believe the government is mistaken – the government would only have contributed an independent ground for relief, i.e., the Court abused its discretion in failing to obtain either a waiver or disqualifying counsel.

- The government does not dispute the fact that two weeks before the scheduled jury selection, Proskauer demanded and was paid a $1 million fee to try Weinstein's case, and even asked that Weinstein's curfew be extended to allow him to meet with counsel at night to help prepare for trial. Yet, the government now attempts to minimize the significance of Proskauer's sudden about-face upon reading, a week before the scheduled trial, the 3500 material containing the Harris

1

statement and the government's 302 on the subject, which caused Proskauer to immediately initiate serious plea negotiations resulting in Weinstein's precipitous guilty plea. GL 4(a) (questioning the proposition that "Proskauer entered the case in December 2012 hell-bent on taking the case to trial").

- The government faults Weinstein for claiming that the Court violated Rule 11. GL1. In making that argument the government ignores the fact that the Proskauer lawyers, in order to convince Weinstein to plead guilty when he had paid so much money so recently in the expectation of a trial, apparently lied to Weinstein by describing a conversation with the Court suggesting leniency. The Court's denial of such a conversation with Proskauer only highlights and exacerbates the conflicts under which Proskauer labored.

- The government never mentions in its motion papers the fact that Rotenstein did more than simply claim that he was informed by Harris to enter into "a legitimate insurance transaction." Rotenstein also said that Harris told him that Weinstein was "simply a consultant," a representation that the indictment alleges was false.

- The government ignores the fact that prior defense counsel (Schoen), "an experienced litigator," according to the government (GL2), stated unequivocally to Harris not only that Harris was an expected witness at trial, but that the Rotenstein transaction was to be the "centerpiece" of the defense, a claim that Schoen repeated to the government on several occasions. Doc#137-1 at ¶8; Doc#52-1 at 27; Transcript of Proceedings (Jan. 17, 2012) at 15; Transcript of Proceedings (Dec. 3, 2012) at 22.

- The government criticizes defense counsel for "publicly fil[ing]" Weinstein's motion papers, including the argument that Harris could be viewed as an accomplice. GL2 n. 1. The government ignores the fact that defense counsel recognized the delicacy of the situation and offered to submit its position in a memorandum solely to the government in an attempt to persuade the government of the validity of Weinstein's position and to resolve this issue without the need for a public filing. Despite the defense efforts, the government immediately scheduled a conference with the Court and asked the Court to resolve the conflict issue on an expedited basis, forcing the defense to file the instant motion.

- The government faults Weinstein for accusing the government of bringing "new charges against Weinstein for committing *new fraud* after he pleaded guilty." GL1. But the new charges allege only fraud committed *prior* to Weinstein's guilty plea. *See United States v. Weinstein*, 13-mj-8148, Counts 2-6 (alleging wire fraud from February to March 2012); Counts 7-13 (alleging violations of ¶1957 from February 2012 to December 2012). The only post-plea allegations are contained in Count One where the government purports to set forth "Weinstein and his Co-Conspirators' Efforts to Avoid Detection."

2

- The government claims that Weinstein has failed to demonstrate that Proskauer's actual conflict had an "adverse impact" on his decision to plead guilty in light of the "overwhelming evidence" supporting Weinstein's fraud contained in the Jencks material. In making this argument the government ignores the fact that much of the "devastating" 3500 material were the subject of prior civil lawsuits involving Weinstein  For example, three of the six victims contained in the redacted Count One were the subject of prior lawsuits. What Proskauer was unaware of were the Rotenstein memos implicating Harris. The "devastating" 3500 material came as no surprise to Weinstein or Proskauer.

Treating adversary counsel in a civil and courteous manner (GL 3, n.1) is a laudatory goal to which defense counsel subscribes. And it is never easy or comfortable to accuse adversary counsel of a serious conflict, which is no doubt why the government decided not to call the Proskauer lawyer on their conflict. But the government's obligation to bring such conflicts to the court's attention, coupled with defense counsel's ethical obligation to represent his client zealously, required this meritorious motion to be made. The motion should be granted.

**B. The Government is Mistaken on the Law.** According to the government, Weinstein ignores controlling case law simply because he failed to cite *Mickens v. Taylor*, 532 U.S. 162 (2001), a case which the government claims stands for the proposition that where "the issue was not raised before Weinstein pled guilty, no prejudice can be presumed." GL2.[1] The government also claims that the "legal

---

[1] The government offers no less than four different standards it claims governs this motion: 1) because the conflict issue was not raised before the plea, "no prejudice can be presumed" (GL1); 2) while prejudice can be presumed, it can only be presumed if the conflict "*significantly*" affected his counsel's performance." GL2 (emphasis added); 3) Weinstein is required to show that he "is actually innocent" (GL6); 4) finally, the government comes around to the correct standard, i.e., "absent timely objection, to obtain relief on the basis of a supposedly disqualifying conflict of interest, the defendant must show an actual conflict that adversely affected counsel's performance." GL7. The government's final formulation is the precise standard that Weinstein set forth in his moving papers. Doc#137-5 at 13.

3

standards" on this motion "remain what they were a month ago" when Weinstein moved to withdraw his guilty plea on other grounds. GL5. The government is mistaken.

Where a motion to vacate a guilty plea is based on a claim that defense counsel was burdened by an actual conflict of interest, prejudice is presumed. The normal or general standards governing a motion to withdraw a guilty plea, including a claim of innocence, simply do not apply. Nothing in *Mickens* is to the contrary. In *United States v. Berberena*, 642 F. Supp.2d 445 (E.D. Pa. 2007), a post-*Mickens* case relied on by Weinstein but ignored by the government, the district court granted a motion to vacate a guilty plea where defense counsel suffered from an actual conflict of interest. There, as here, the government relied on *Mickens* as somehow precluding relief. The court rejected the government's attempt in language that deserves extended quotation because of its direct applicability here:

> [T]he Government cites *Mickens* as the governing legal standard, and suggests that *Mickens* established an "adverse effects" test that in some way differs from *Morelli,* 169 F.3d 798 (3d Cir. 1999). The Court disagrees. In *Cuyler v. Sullivan*, 446 U.S. 335(1980), the Supreme Court held that, absent an objection at trial, a defendant claiming ineffective assistance based on a conflict of interest must demonstrate that a conflict actually affected the adequacy of counsel's representation. Id. at 348-49,  In *Mickens*, petitioner argued that where the trial judge neglects to inquire into a potential conflict, a defendant only has to show that his lawyer was subject to a conflict of interest, and not that the conflict adversely affected counsel's performance.. The Court rejected petitioner's argument and held that the *Sullivan* rule applies even when the trial court failed to inquire into a potential conflict.
>
> In *Morelli*, the Third Circuit elaborated on what constitutes an actual conflict. ("In order to establish an actual conflict the petitioner must show two elements"). The Court agrees with Petitioner that the standard set forth in *Morelli* encompasses *Sullivan's* "adverse effects" requirement. Thus, if a defendant meets the two- prong *Morelli* test, he necessarily has established that the conflict of interest adversely affected counsel's performance as required under *Sullivan*. See *Mickens*, 535 U.S. at 172 n. 5, ("We have used `actual conflict of interest' . . . to mean what was required to be shown in *Sullivan*. . . . An `actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."); *United States v. Gambino*, 864 F.2d 1064, 1070-71 (3d

4

>Cir.1988) ("Clearly, a defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it.").

642 F. Supp. 2d at 449 n. 3 (full citations omitted).

In short, the standard governing Weinstein's motion is the same standard set forth in the Third Circuit's decision in *Zepp*: "in order for the defendant to make out a violation of her sixth amendment rights, she must establish that an actual conflict of interest adversely affected counsel's performance but she need not demonstrate actual prejudice." 748 F.2d at 134. Weinstein's motion has more than satisfied the *Zepp* standard.

For much the same reason, the government is mistaken when it claims that Weinstein must demonstrate "actual innocence." GL6. While Weinstein does claim he is innocent, a claim of innocence is beside the point. The issue is whether Weinstein received the effective assistance of counsel with respect to the critical decision whether to plead guilty and on what terms. Whether or not Weinstein is "actually innocent" is not the relevant question on this kind of motion.

The government also makes the irrelevant and baseless claim that it would suffer prejudice if Weinstein were allowed to withdraw his plea. As an initial matter, the government should have thought of that consideration when it permitted Proskauer's representation of Weinstein to proceed unchallenged at the guilty plea. Even if the government's claim of prejudice were a valid basis to deny a motion to withdraw a guilty plea based on conflict—and it is not— the government's claim is based on a gross misrepresentation of the facts. For example, according to the government, "[a]t least one potential witness, David Cohen, has died." Doc137-1 at 10. As the government is well aware, even if the case had proceeded to trial, David Cohen could not have been a

5

witness since he was already deathly ill. Indeed, to the extent that Cohen was a witness, he would undoubtedly have been a defense witness. Indeed, in December 2012, Schoen wrote to Weinstein, "Obviously, as you have indicated, David Cohen cannot testify due to his health (he would have been key on many subjects). He is aware that MR characterized his role in the matter as being to lend you money." Creizman 12/29/13 Decl. at ¶4.[2]

    **C. Klingeman Cannot Save Proskauer or the Government.** According to the government, Weinstein cannot show that his representation by Proskauer adversely affected him since he was also represented by Klingeman who "advised Weinstein to plead guilty on the terms that Proskauer had secured." GL9.[3] The government cites no support for its factual representation, and there is none. On the contrary, the record supports only one conclusion, i.e., Klingeman did not advise Weinstein on his guilty plea and had nothing to do with Weinstein's last minute change of mind and decision to plead

---

[2] Nor is there any more validity to the government's claim that permitting Weinstein to withdraw his guilty plea would delay "justice" for the victims of Weinstein's crimes. To the extent that Weinstein's plea is vacated, as it should be, he is presumed innocent, and his " victims," if any, are merely "alleged victims." It is interesting the government wants to avoid delay when speed suits its purposes, but tolerates extraordinary delay when it does not matter to the government. Thus, it is worth noting the extraordinary delays attributable to the government. For example, the government waited more than 14 months to indict Weinstein, despite the fact that the complaint alleged more than a $200 million fraud. Furthermore, despite the fact that Weinstein pleaded guilty in January 2013, it took the Probation Department 11 months to produce a pre-sentence report, without complaint by the government. Yet, in the government's view, it is Weinstein who will have caused his alleged victims excessive delay if this motion is successful.

[3] The government suggests that any conflict was somehow obviated or cured by the fact that unconflicted counsel "had more than a year to investigate the circumstances" resulting in the Proskauer conflict. GL2, 8. The government ignores that the conflict in this case surfaced during the last week of December 2012, when Proskauer entered the case. At that point, Schoen was no longer in the case, Klingeman went off on vacation, Proskauer accepted $1 million to try a case and the government stood by in silence.

6

guilty. Nothing was said on the record of the plea proceedings that in any way supports the importance the government attributes to Klingeman. Moreover, the plea agreement was negotiated between lawyers from Proskauer and the government. Indeed, Klingeman made it clear to Proskauer that once Proskauer entered the case, Klingeman deferred to them completely: "As I mentioned to Mark [Harris] on 12/21 and Bob [Cleary] on 12/26, I will take whatever role (including no role) to achieve the best result for Eli." Creizman 12/29/13 Decl. ¶3. In fact, "no role" is the role Klingeman assumed since he went off on vacation while Proskauer began to prepare the case for trial and then negotiated the terms of Weinstein's guilty plea once Proskauer—but *not* Klingeman (contrary to the government's suggestion (compare GL2 with Creizman 12/26/13 Decl. ¶10)—reviewed the Jencks Act material.

      **D. Harris had an actual conflict**. Without addressing the facts of many of the cases relied on by Weinstein, the government claims in conclusory fashion that "this case is different—profoundly different —from the ones cited in Weinstein's motion." GL2. The government is correct, but for the wrong reasons. This case is actually a stronger conflict case for the defendant than the cited cases. Conversely, if an actual conflict existed in the cited cases, *a fortiori* it existed in this case.

      Indeed, the government misunderstands the one case it purports to address (*Zepp*). The government claims that Harris's exposure "was not in the same galaxy as defense counsel's in *Zepp* who faced criminal charges on the same conduct for which defendant was tried." GL11. In *Zepp*, however, the majority took pains to point out that "there is no direct evidence of wrongdoing by trial counsel," and it was "not necessary to assume wrongdoing to conclude that he had an actual conflict of interest." 748 F.2d at 136. All

7

that was necessary was that "trial counsel had equal access and opportunity while alone in the house with Zepp to flush cocaine down the toilet." *Id.* Indeed, the concurrence in *Zepp* took the position that it did "not believe that on a record such as this one, it is appropriate to accuse attorney James of incriminating his own client to save himself from charges of criminal complicity. The professional and personal consequences of such labeling can be dire, and as I have pointed out, I think the present record cannot support any such conclusion." *Id.* at 145. The majority rejected such a position since all that is necessary to establish an actual conflict was "potential" liability which defense counsel in *Zepp* "could have faced," as well as disciplinary charges.

The government makes the highly qualified claim that, "as far as [it] can tell," Harris did "nothing to *intentionally* further Weinstein's fraud," nor did he witness any events that would have "required" his testimony at trial. GL2. Not only are the government's impressions irrelevant, they are highly questionable.

According to the government, Harris's testimony would be irrelevant since the fraud derived from how Weinstein spent the money, and not from the "legitimate insurance transaction [proposed] to Mr. Rotenstein." GL 3. The government ignores the fact that fraud is only accomplished if there is deceit. Precisely what Weinstein or those acting with him "proposed" to Rotenstein would determine whether any fraud existed in how Weinstein spent the money he received from Rotenstein. Because Weinstein, Harris and Rotenstein discussed those terms at a meeting in February 2011, the government's present claim that Harris is not a relevant or necessary witness rings hollow.

Indeed, at the February 2011 meeting, if Weinstein made representations consistent with the account that Rotenstein gave, the government would undoubtedly

8

want to call Harris to corroborate Rotenstein's word. Conversely, if Weinstein's representations to Rotenstein were different from the representations Rotenstein claimed were made to him, Harris would have been a necessary or important defense witness. Certainly this is the way prior defense counsel (Schoen) viewed the matter since he expressed to Harris his intention to call Harris as a witness at trial. Doc#137-1 at ¶8.

The government also fails to acknowledge the full scope and significance of Rotenstein's statements, which is devastating to the government's position on this motion. Harris not only opined on the legitimacy of the insurance investment, but he also informed Rotenstein that "Weinstein is just a consultant in the matter," a claim the indictment alleges is false. *See* Indictment ¶65(c) ("Defendant Weinstein induced MR to invest in the insurance deal by making the following misrepresentations, among others: . . . defendant Weinstein had no stake in this deal"). The government simply omits this part of Rotenstein's description of Harris's advice. On the basis of the "consultant" statement alone, Harris could be viewed as an accomplice of Weinstein, assuming Weinstein misrepresented his role and intentions to Rotenstein. Indeed, it was precisely these kinds of "assurances" that the courts in *Lacerdo* and *Kolodesh* relied on to disqualify defense counsel based on actual conflict of interest.

The government makes no attempt to explain why, if Harris was a witness to wholly innocent conduct, it was necessary to have Rotenstein "identify Harris from a photo" (DM, Ex. B at 6), why the government questioned Rotenstein as to whether "he was positive" that Harris spoke to him about the insurance deal, and whether he was "certain" that "Harris told him it was ok," and obtained from Rotenstein a statement in writing concerning his encounter with Harris.

9

The government professes to be offended that Weinstein would claim that Harris "could be viewed as a co-conspirator and an accomplice." GL n. 1. The government ignores Weinstein's insistence that Harris committed no crime, and did nothing wrong, because neither did Weinstein. In Weinstein's view (as Harris would attest), the account Rotenstein provided to the government was false. But that fact simply highlights Harris's unavoidable role as a witness at trial. And if for some reason Weinstein was criminally involved, it also highlights the fact that a finder of fact could also have concluded that Harris was an accomplice to Weinstein's alleged misrepresentations.

### E. The Court's Awareness of the Conflict Would Provide An Independent Basis for Relief.

Weinstein did not allege in his motion papers the Court's awareness of the actual conflict with which Proskauer was burdened, and for a simple reason: the conflict was never directly brought to the Court's attention by the party in the best position to do so, i.e., the government. Seeking to shift the blame, the government claims that the Court was undoubtedly aware of the conflict, as Weinstein and Klingeman should have been. Like the defendant in *Zepp,* a defendant like Weinstein cannot be saddled with the knowledge and duty to bring a conflict to the court's attention. For all Weinstein knew, it was wholly legitimate for Harris to testify at trial as well as continue to represent him at trial. To the extent that the Court was aware of the conflict, which we doubt, that is an independent ground for relief:

> The defendant also contends that the trial judge was put on notice of the conflict and made no determination as to whether she fully understood the nature of the conflict, did not seek an intelligent and competent waiver, and did not disqualify defense counsel. *Government of Virgin Islands v. John*, 447 F.2d 69 (3d Cir. 1971). We agree and conclude that the trial judge abused his discretion in failing to do so.

10

*Zepp*, 748 F.2d 125, 139 (3d Cir. 1984).

## CONCLUSION

For the foregoing reasons and those set forth in his moving papers, Weinstein's motion to withdraw his plea should be granted.

Dated: New York, New York
       December 29, 2013

    /s/ Eric M. Creizman
Eric M. Creizman
Creizman PLLC
565 Fifth Avenue, 7th Floor
New York, New York 10017
Tel: (212) 972-0200
Email: ecreiz@creizmanllc.com
*Attorneys for Eliyahu Weinstein*

RICHARD A. GREENBERG
STEVEN Y. YUROWITZ
NEWMAN & GREENBERG
*Of Counsel*

11